**MEL DAR CORPORATION, a corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Coy BURNETT and Mildred K. Burnett, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 17421–17423.**

United States Court of Appeals
Ninth Circuit.

Oct. 27, 1962.

Rehearing Denied Dec. 6, 1962.

---

Enright, Elliott & Betz, Joseph T. Enright, Norman Elliott, and Bill B. Betz, Los Angeles, Cal., for appellant.

Crane C. Hauser, Chief Counsel, Internal Revenue Service; Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Arthur I. Gould, and John B. Jones, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee.

Before BARNES, HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Petitioners, Coy Burnett and Mildred K. Burnett, are husband and wife who

duly filed joint income tax returns for the calendar years 1951 and 1952. In 1957 the Commissioner of Internal Revenue assessed deficiencies in taxes against them for 1951 in the amount of $48,160.92 and for 1952 in the amount of $78,905.72. Petitioner Mel Dar Corporation is a Nevada corporation with its principal place of business in Los Angeles, California, which is wholly owned by the Burnett family. Using the accrual method of accounting, Mel Dar duly filed its tax returns for the fiscal years 1952 and 1953 covering the period beginning with May 1, 1951 and ending April 30, 1953. The Commissioner in 1955 assessed against Mel Dar deficiencies in income and excess profits taxes in the amount of $62,772.68 for fiscal 1952 and $7,733.28 for fiscal 1953. The Burnetts and Mel Dar filed petitions in the Tax Court for redetermination of deficiencies. The petitions were consolidated for trial in the Tax Court due to common issues of fact and law. The Tax Court had jurisdiction by virtue of section 272(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 272(a). After decisions favorable to the Commissioner petitioners timely filed petitions with this court for review of the Tax Court decisions. The above entitled cases were consolidated for review. We have jurisdiction under the provisions of section 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

In the Tax Court the parties entered into an extensive stipulation of facts. At trial the petitioners produced five witnesses and introduced certain documentary and photographic exhibits. The Commissioner offered no evidence. The Tax Court adopted the parties' stipulation of facts and then paraphrased many of them in its Memorandum Findings of Fact and Opinion. Thus, on review the facts are substantially undisputed.

At all times pertinent to this case Coy and Mildred Burnett have been owners of Shamrock Island which is about 130 acres of land located off the coast of Corpus Christi, Texas. The high potential of Shamrock Island for oil and gas production was demonstrated prior to 1950 when the Atlantic Refining Company under leases from the State of Texas began producing oil and gas from adjoining property.

In February, 1950, the Burnetts entered into negotiations with Mar-Tex Realization Corporation, hereafter Mar-Tex, for an oil and gas lease to Shamrock Island. Thereafter, the Burnetts terminated the negotiations. On April 8, 1950, Mar-Tex instituted a suit against the Burnetts in the District Court of Nueces County, Texas, contending that it had a valid lease or contract to make a lease and praying that the Burnetts be compelled to deliver an oil and gas lease to Shamrock Island.[1] Under the terms of the lease claimed by Mar-Tex, it was entitled to possession of the property and 60% of the oil and gas produced therefrom. The Burnetts contested the Mar-Tex suit.

On May 19, 1950, petitioner Mel Dar Corporation, was incorporated in Nevada as the successor to Mel Dar Company, a family company owned by the Burnetts and their married daughters. Mel Dar Corporation was thus a closely held family corporation.

On June 5, 1950, the Burnetts entered into a lease with Mel Dar Corporation for the development of Shamrock Island for oil and gas purposes. The Burnetts as lessors in the Mel Dar lease were to receive from the lessees 25% of the gross receipts from the sales of oil and gas produced upon Shamrock Island. Financing arrangements were made with the Security National Bank of Los Angeles with whom the Burnetts had dealt over a period of many years in connection with other enterprises. The bank was kept informed of all phases of the Shamrock oil operations. As lessee, Mel Dar commenced operations for the production of oil and gas, the bank having agreed to lend Mel Dar $150,000 as of August 14, 1950.

---

[1]. On April 12, 1950, a Notice of Lis Pendens was filed with the state court and recorded by Mar-Tex.

The lease was amended on August 8, 1950, at the suggestion of the bank and it had been amended once before on July 3, 1950. These amendments provided certain changes in favor of Mel Dar. They referred to the Mar-Tex litigation and provided "as additional consideration" a conditional royalty of $100,000 after payment of expenses of the venture and the creation of a reserve of current assets equal to one and one-half times current liabilities. Paragraph 10 of the August 8, 1950, "Second Amended Lease" provided for the possibility of further amendments in the event "a change of any kind is deemed advisable by the parties hereto." [2]

The August 14, 1950, agreement between Mel Dar and the bank in which the bank agreed to loan Mel Dar $150,000 provided, among other things, that (1) the loan would be used solely for financing Shamrock Island Oil development, (2) so long as the loan existed Mel Dar would submit its financial policy to the bank for clearance, (3) Mel Dar would not "cancel, alter or modify the leasehold estate" to Shamrock Island without the bank's consent. On the same day the Burnetts agreed to subordinate in favor of the bank all existing and future claims held by them against Mel Dar except the Burnetts' royalty under the lease as amended; however, the Burnetts agreed to lend back to Mel Dar the proceeds from their royalty from Shamrock Oil development. Part of the $150,000 loan made by the bank was used to liquidate an existing indebtedness of approximately $60,000 which Mel Dar had obtained from the bank and had used to pay Shamrock Oil expenses, and the balance of approximately $90,000 was received in cash by Mel Dar from the bank.

After some difficulty in obtaining drillers to deal with Mel Dar, Coy Burnett on September 9, 1950, entered into a contract with A. J. Bankhead Drilling Company, Inc., for the drilling of the first oil well on Shamrock Island on a cash footage basis. Mel Dar paid this expense, and the drilling of the first well began on October 5, 1950.

As the time approached when oil was expected to be produced, attempts were made to find a buyer for the oil. Atlantic Refining Company held most of the leases surrounding Shamrock Island and it was approached as a prospective buyer. Atlantic refused at first. Later, however, on October 25, 1950, Atlantic agreed to buy the oil produced on Shamrock Island in consideration of Burnetts' granting to Atlantic easements and sites on Shamrock Island for tanks and a pipeline, and upon the further condition that Atlantic could withhold and impound 60% of the proceeds in order to protect itself from any possible claim by Mar-Tex.

On October 16, 1950, before any oil had been produced and before Atlantic had agreed to purchase any oil, Mel Dar and the Burnetts made another agreement entitled "Lease Amendment" which, after reciting certain difficulties which had occurred, made certain changes in the royalty payments to be made by Mel Dar to the Burnetts. The principal change in these payments was that the Burnetts were to receive 25% of the "net profits" as defined therein instead of 25% of the gross sales as provided for in the August 8, 1950, amendment.

The first well on Shamrock Island was completed on November 7, 1950, and the oil it produced was sold shortly thereafter to Atlantic in accordance with the agreement.

2. 10. Because a claim of a prior lease to Shamrock Island presents a threat which may become a hazard whose limits cannot definitely be foreseen, and because certain rights concerning accretion, excretion and avulsion might substantially change the type of development which would be to the best interest of all parties hereto, it is hereby agreed that if a change of any kind is deemed advisable by the parties hereto, or if necessary by the arbitration herein provided by Paragraph 14 hereof, it is the agreed intention that the relative interests, advantages and disadvantages of the respective parties shall, as nearly as possible, be evaluated, retained, translated into and continue to exist in such changed programs or procedure.

In the fall of 1950 the litigation between Mar-Tex and the Burnetts was proceeding.[3] On October 30, 1950, a jury trial commenced on the question whether there was a valid lease or contract entered into between Coy Burnett and Mar-Tex requiring Coy Burnett to execute and deliver an oil and gas lease. This was the first phase of the Mar-Tex suit. On November 7, 1950, the jury decided this issue in favor of Mar-Tex.

On April 30, 1951, Mel Dar intervened in the Mar-Tex suit claiming reimbursement for amounts expended by it in the development of Shamrock Island for oil and gas purposes and for any enhancement in the value of the leasehold. This was the second phase of the Mar-Tex suit and it was tried before the court without a jury. On August 1, 1951, the court entered judgment upon the verdict for Mar-Tex finding that it was entitled to the lease claimed, and judgment was entered for the Burnetts and Mel Dar holding that they were entitled to reimbursement for the $513,000 expended by Mel Dar up to that time for development. The court, however, denied recovery for any enhancement in the value of the lease. The Burnetts appealed the lease question and Mel Dar appealed the enhancement question. In June, 1952, the Texas Court of Civil Appeals reversed the trial court, holding that as a matter of law there was no lease or contract to make a lease.[4] The court did not reach the question of the enhancement raised in Mel Dar's appeal. The Texas Supreme Court denied an Application for a Writ of Error in November, 1952, and the litigation was finally terminated when a motion for a rehearing was denied.

Pursuant to its agreement Atlantic impounded a large sum of money (60% of the proceeds from the sale of oil) from the commencement of oil production until December, 1951. On December 18, 1951, after negotiations, Atlantic released the impounded funds to Coy Burnett upon receipt of a bond on which Burnett was the principal and on which the United States Fidelity and Guaranty Company was surety. The bond protected Atlantic in the event Mar-Tex was finally successful in its litigation. The money received from Atlantic under this arrangement was deposited by Burnett into Mel Dar's account. Subsequently, some of this money was distributed to the Burnetts as their royalty interest in the leased property. When the Mar-Tex litigation was finally determined against Mar-Tex, Atlantic released the remainder of the impounded funds to Burnett and this also was deposited in the Mel Dar account.

A number of contentions are made by petitioners relating to the determinations of the Commissioner which were for the most part approved by the Tax Court. Of necessity, they are treated separately in this opinion.

## I

The principal problem in this case relates to the October 16, 1950, amendment to the lease between the Burnetts and Mel Dar which changed the Burnetts' royalty interest from 25% of the *gross* receipts from the production of oil and gas to 25% of the *net* profits from such production. In 1954 the lease was amended to provide once again for a 25% gross royalty to the Burnetts. The Commissioner disallowed any tax vitality to the October 16, 1950, amendment and determined that the Burnetts were considered for tax purposes at all times to have been entitled to a 25% *gross* interest in the proceeds from Shamrock Island. The Tax Court approved the Commissioner's determinations of tax deficiencies arising out of the Commissioner's non-recognition of the 25% net profits amendment. The Tax Court held that the amendment lacked business purpose and was entered into solely for the

---

3. The Burnetts had denied the claim of Mar-Tex as to its right to a lease and in addition had cross complained for reimbursement of expenses in the event that it was held that Mar-Tex was entitled to a lease.

4. Burnett v. Mar-Tex Realization Corp., 250 S.W.2d 612 (Tex.Civ.App.1952).

purpose of shifting the incidence of taxation.

The business purpose doctrine was established by Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 56 (1935) aff'g, 69 F.2d 809 (2d Cir. 1934). In that case the taxpayer had an elaborate scheme to take advantage of the provision in the tax code that in corporate reorganization the distribution of stock of one corporation by the other to its shareholders results in no gain to the shareholders. The scheme was designed expressly and exclusively for the purpose of taking advantage of the favorable tax provision, and although the reorganization was letter-perfect in form the Court held that the transaction could have no tax vitality for it lacked substance and business purpose (apart from the avoidance of taxes). The transaction though a "reorganization" in form was not a "reorganization" within the meaning of the special tax provision. As the Court stated, "To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose." [5] The following quotation from Judge Learned Hand's Gregory opinion in the Court of Appeals is instructive:

> "We agree with the * * * taxpayer that a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. * * * The purpose of the section [Internal Revenue Code of 1928 § 112(g) corresponding to the present § 368(a) (1) (D) of the 1954 Code, 26 U.S.C.A. § 368(a) (1) (D)] is plain enough; men engaged in enterprises—industrial, commercial, financial, or any other—might wish to consolidate, or divide, or add to, or subtract from their holdings. Such transactions were not to be considered as 'realizing' any profit, because the collective interests still remained in solution. But the underlying presupposition is plain that the readjustment shall be undertaken for reasons germane to the conduct of the venture in hand, not as an ephemeral incident, egregious to its prosecution. To dodge the shareholders' taxes is not one of the transactions contemplated as corporate 'reorganizations.' " [6]

The business purpose doctrine of Gregory applies to all sorts of varying situations which arise under the tax statutes. It serves as a constant reminder that business transactions must have some purpose other than the mere avoidance of taxes.[7]

We believe there is substantial merit to the petitioners' contention that under all the circumstances of this case it is clear that the change of Burnetts' royalty from 25% gross to 25% net had business purpose. In early 1950 it was imperative that the Burnetts develop Shamrock Island for oil and gas purposes immediately due to the fact that wells were operating on surrounding property and were draining oil and gas from a common underground pool. The Mar-Tex suit was instituted in which it was claimed that the Burnetts were not entitled to possession of the property and a lis pendens was filed. This made it difficult to get independent companies to develop Shamrock Island. As a result Burnetts were forced to develop the property themselves and they reformed their family corporation for this purpose. A substantial amount of capital was needed for development and large loans had to be made to Mel Dar. As a condition to Mel Dar's loans the bank involved required the Burnetts

5. 293 U.S. at 470, 55 S.Ct. at 268.

6. Helvering v. Gregory, 69 F.2d 809, 810–811 (2d Cir. 1934).

7. See Surrey & Warren, Federal Income Taxation, ch. 9, § 3 (1960 ed.).

to subordinate their claims against Mel Dar to those of the bank. The Burnetts' royalties were not subordinated, however; but the Burnetts agreed with the bank to loan back to Mel Dar all proceeds received from Shamrock Island production during the development stage. In an earlier amendment to the lease it was recognized by the parties that further amendments to the lease might be necessary in order to adjust the situation between the parties, especially in view of the pending Mar-Tex suit. The existence of the Mar-Tex suit also made it difficult to find a buyer for the oil that was expected to be produced from Shamrock Island. Atlantic Refining Company had been asked to buy the oil but it at first refused. Thus, while the Mar-Tex suit might have at first seemed to be a mere nuisance suit it loomed much larger several months later as the trial date neared and as it became apparent that buyers for the oil would not be easy to find. The importance of the Mar-Tex suit is perhaps demonstrated by the fact that the jury returned a verdict in favor of Mar-Tex. In October it could well have appeared to the parties that Mel Dar might be entitled to terminate its obligations, either because the Mar-Tex threat constituted a breach of Burnetts' covenant of quiet enjoyment or because the inability to find a ready buyer frustrated the purpose of the lease. Furthermore, it was to be expected that a buyer when found would want to protect itself by impounding proceeds from the oil sufficient to care for any interest to which Mar-Tex might be entitled. The effects of such an impound on the Burnetts and Mel Dar under their agreement before the amendment existed would give rise to some interesting facts. Out of every $100,000 received from production of the four planned wells $60,000 would be impounded being unavailable for use. The driller, Bankhead, would be entitled to $22,500 in payment for drilling the last three wells (the first having been paid for). Thus, only $17,500 would be left. But Mel Dar was required to pay Burnetts 25% of the gross or $25,000. In order to meet this payment Mel Dar would have to borrow $7,500 from another source. Thus, so long as the impound remained in effect nothing from the proceeds was available to Mel Dar for servicing its debt to the bank and in addition for every $100,000 gross receipts Mel Dar would be $7,500 further in debt.

Taking all these facts into consideration there would seem to be ample business purpose for an amendment of the lease giving the Burnetts a 25% net interest rather than a 25% gross interest.

The Tax Court relied principally on the proposition that the Burnetts received no consideration for decreasing their interest, arguing that Mel Dar's forbearance to cancel the lease could not supply consideration since it had no right to cancel in view of the existence of the Mar-Tex suit at the time when the original lease was entered into in June. However, we think there was consideration to the Burnetts. There is considerable support in Texas law for the position that Mel Dar did have a right to get out from under the lease,[8] and, even if it did not have such a right which would ultimately be upheld in court, the forbearance to cancel based upon a belief in the existence of such a right would supply the consideration. The positive existence of a right to cancel would not be necessary. All that is necessary for consideration is a forbearance of the right to cancel based on a belief in the existence of the right, and such a belief could reasonably be founded upon a more serious outlook toward the Mar-Tex suit as trial approached and the difficulty in finding a ready buyer for the oil. The prospect of having to pay out $7,500 more than was taken in, even though only a temporary condition (during the pendency of the Mar-Tex suit), was not an attractive one. The money would have to be obtained from some place. Furthermore, the bank had loaned large sums of

8. The Tax Court in its opinion stated that "Mr. Burnett virtually guaranteed peaceful possession of the property."

money and its interest would certainly be adversely affected by Mel Dar's inability to service the debt during the pendency of the suit and Mel Dar's cash payments in excess of its receipts.

It can well be understood how the Burnetts and Mel Dar, dealing at arm's length, would desire a temporary cutback in the royalty under the facts of this case. The Burnetts under the loan agreement of Mel Dar with the bank were required to loan back to Mel Dar any funds received as royalty from production. If the Burnetts received 25% of the gross they would have to pay income taxes on that amount and then loan the remainder back to Mel Dar. During the development period it would make much more sense to leave the money with Mel Dar rather than extract it (causing Mel Dar to pay out $7,500 more than it received), pay taxes on it, and then return it to Mel Dar in the form of a loan. As Judge Learned Hand said in Gregory, "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury * * *." [9]

We think that the amendment to the lease had ample business purpose. It was an amendment which was warranted by the situation albeit true that it was not unalterably required. An independent third party developer might well have required the Burnetts to do the same thing.

We are not dealing here with an elaborate artifice involving ghostly or collapsible corporations, fictional leases or contracts, phony sales or other transactions which lack substance. Here is not an ingenious scheme for using existing business forms as vehicles solely for the purpose of avoiding taxes. One esteemed jurist has said that the business purpose doctrine "covers only those transactions that do not appreciably change the tax-

payer's financial position, either beneficially or detrimentally." [10] If this is true the doctrine does not apply to this case where the financial position of the taxpayers was substantially altered in a real sense by the lease amendment. We think that under all the circumstances the evidence does not support a holding that the amendment was a "sham" or a "masquerade" but that it does establish that there was a business purpose to the amendment and that the Gregory doctrine does not apply to deprive the transaction of its tax vitality. Accordingly, we hold that the appellants should be taxed on the basis that the October 16, 1950, amendment to the lease was valid.

## II

Prior to the termination of the Mar-Tex litigation the Burnetts secured the release of some impounded funds from Atlantic after executing a bond in favor of Atlantic on which the United States Fidelity and Guaranty Company was surety. The Tax Court ruled that the money received from impound was income at the time received. [11] The petitioners herein contend that under accrual methods of accounting the money received from impound was not income until the final termination of the Mar-Tex suit when Mel Dar became indefeasibly entitled to the money.

The Tax Court held that the income accrued when the money was released by Atlantic relying on the claim of right doctrine as first announced in North American Oil v. Burnet, 286 U.S. 417, 52 S. Ct. 613, 76 L.Ed. 1197 (1932). In that case North American was producing oil as the beneficial owner of property owned by the United States. The United States brought an action in which it claimed to be the beneficial owner, and the United States secured the appointment of a receiver to hold onto the income pending the outcome of the litigation.

9. See note 5 supra.

10. Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 412 (2d Cir. 1957) (dissenting opinion per Learned Hand, J.).

11. The Tax Court rejected the contention of the Commissioner that the money which was impounded was income as the sales were made (i. e. as it was impounded).

The income was paid to the receiver during 1916. In 1917 the trial court ruled in favor of North American and the receiver was discharged. The accumulated funds were paid over to North American. After various appeals the litigation was finally terminated in North American's favor in 1922. The Commissioner alleged that the money which had been in the hands of the receiver was income for 1917 when received, whereas North American contended that it was income either for 1916 when made or for 1922 when the litigation was finally terminated. The Supreme Court upheld the Commissioner's contention that the income was reportable in 1917. It was not reportable in 1916 because at that time it might never have been paid to North American. And the following was given in explanation of why it was not reportable in 1922:

> "The net profits earned by the property in 1916 were not income of the year 1922—the year in which the litigation with the Government was finally terminated. They became income of the company in 1917, when it first became entitled to them and when it actually received them. If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." [12]

The Tax Court felt that this case was controlled by North American, and we

agree. There were no restrictions on Mel Dar's right to use the money. The release was unconditional (subject only to the execution of a bond), and the income was properly accrued at that time. If Mar-Tex had won and Mel Dar had been required to return the money to Atlantic, adjustments for tax purposes would have been made.

The petitioners rely on United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961), but we think that case is different from this one and that the facts of this case are more closely akin to those in North American.[13]

### III

■ Mel Dar incurred and paid certain expenses in developing Shamrock Island during the pendency of the Mar-Tex suit. The Tax Court held that the expenses were deductible only in the year when paid, rejecting Mel Dar's contention that they were deductible at the time when the Mar-Tex litigation became final. Mel Dar argues that the expenses though paid were not accrued from a tax standpoint because the possibility existed that Mar-Tex would become liable for the expenses in the event Mar-Tex prevailed in its suit. To be consistent with our decision herein that the money received from impound was income when received, we uphold the Tax Court on this point. The expenses were properly deductible when paid not when the Mar-Tex litigation was terminated. Mel Dar became obligated to develop Shamrock Island and expenses were incurred relating to this development and the production of oil and

12. 286 U.S. at 424, 52 S.Ct. at 615.

13. In Consolidated Edison the taxpayer had paid a local property tax under protest and then instituted a suit for its recovery in the proper state court. The government argued that the tax accrued (for deduction purposes) when it was paid and that there was a mere contingency that a portion of the tax would be refunded. The taxpayer argued that the liability for the contested portion of the tax was not admitted and that the mere payment under protest did not require accrual for tax deduction purposes.

The Court held with the taxpayer that the payment was not the point at which an expense accrued but rather that the expense accrued when liability for the tax was finally adjudicated by the state court. The Court relied on the "all events" test where an item is said not to accrue until all events have happened which fix the liability therefor. The Court was evidently impressed with the fact that the only way to test liability for the tax was to pay under protest and then sue for a refund.

gas. But the expenses were Mel Dar's and no one else's. The obligation to pay the expenses would always be Mel Dar's as the principal, even though Mar-Tex might become liable to Mel Dar for reimbursement in the event Mar-Tex won its suit. Mar-Tex would never become liable as such for Mel Dar's expenses. Mel Dar's liability for the development expenses which it incurred was not contingent in any way, and thus the expenses accrued when paid.

## IV

■ Mel Dar incurred certain legal expenses with respect to the Mar-Tex suit and these were claimed by Mel Dar as deductions for ordinary and necessary business expense. Mel Dar intervened in the Mar-Tex suit after Mar-Tex had obtained a favorable jury verdict. Mel Dar contends that its participation was limited to seeking reimbursement and enhancement from Mar-Tex in the event a favorable judgment was ultimately obtained by Mar-Tex. This was the so-called second phase of the Mar-Tex suit. The Commissioner disallowed deductions for those expenses on the grounds that the expenses were really those of the Burnetts and that in any event the expenses were capital in nature and thus recoverable through depletion after being capitalized but not deductible as ordinary business expense. The Tax Court did not rule on the former ground in view of its determination that the latter ground was meritorious. The Tax Court stated:

"We conclude from the record as a whole in so far as it bears upon this issue, that the Mar-Tex litigation was primarily a title suit, and that the issues of reimbursement for expenses and compensation for enhancement were only corollary and subsidiary thereto. To be sure, the jury verdict of November 1950 forced Mel Dar to actively pursue the accounting, i. e., reimbursables phase of the proceeding. Nonetheless, the primary issue was still that of title and the proceeding to determine the reimbursables a mere incident thereof. This issue (title) was still very much in the case, and was in fact eventually so resolved as to make moot all matters pertaining to reimbursement and enhancement."

We agree.

We also consider the Burnetts' contentions with respect to disallowance of their expenses by the Commissioner to be without merit for the reasons contained in the opinion of the Tax Court.

## V

■ Mel Dar purchased private residential property at 107 Fremont Place in the Beverly Hills section of Los Angeles. Deductions for certain expenses incurred with respect to the property were disallowed by the Commissioner on the ground that they were not ordinary and necessary business expenses. The house was located across the street from the Burnetts' residence. It was rented to one of Burnetts' daughters for $160 a month, which yielded a sum in rent less than one-half the out-of-pocket cost of taxes and interest, and which yielded a sum far below the total of taxes, interest, maintenance, repairs and depreciation. Mel Dar had never before purchased private property for investment or income purposes. The Tax Court held that the property had been purchased merely as an accommodation to Burnetts' daughter in order to provide her with a bargain rental. We think this conclusion is correct and unassailable under the facts. The deductions were properly disallowed.

## VI

■ There is another question which remains to be considered. On January 17, 1934, Mel Dar Company, the predecessor of Mel Dar Corporation, a petitioner herein, executed a five-year nonpersonal liability promissory note for $162,072.28 to J. W. Jameson Corporation. Pledged as collateral for the note were 16,208 shares of Monolith Portland Cement Company, hereafter Cement, in which corporation the Burnetts held a majority interest. Various extensions

of the maturity date took place. On January 28, 1938, Coy Burnett was substituted for Mel Dar Company as principal on the note. The purpose of the loan had been to enable the Burnetts to retain control of Cement and another company by buying out certain dissenting shareholders who had questioned various transactions of the Burnetts.

Mel Dar Corporation was incorporated on May 19, 1950, and on June 1, 1950, the Burnetts transferred to Mel Dar $1,000 in cash, 1,000 shares of common stock in Mel Dar Company, and 54,804 shares of common stock in Cement. The Burnetts received in return 20,000 shares of preferred and 69,800 shares of common stock in Mel Dar Corporation. Included in the 54,804 shares of Cement were the 16,208 shares that had been pledged as security for the Jameson note; thus Mel Dar took the shares subject to the as yet unpaid note.

On June 5, 1950, Mel Dar Company was dissolved and its assets were distributed to Mel Dar Corporation in exchange for the 1,000 shares of Mel Dar Company stock which had been received from the Burnetts. Among the assets received were 51,920 shares of Cement. On or about June 5, 1950, Cement common stock was quoted at $5 per share on the Pacific Coast Stock Exchange. Mel Dar carried the unpledged shares in Cement on its books at $5 per share. The 16,208 pledged shares had an adjusted basis of $66,858 ($4.125 per share), but were not carried on Mel Dar's books at any value. The Jameson note was never listed as an indebtedness on Mel Dar's books.

For purposes of computing its excess profits tax credit Mel Dar contends that the Jameson note must be included in "borrowed capital" within the meaning of section 439(b) (1) of the Internal Revenue Code of 1939, 26 U.S.C. § 439 (b) (1) (1952 ed.):

"439(b) Daily borrowed capital. For the purposes of this subchapter, the daily borrowed capital * * * shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. In the case of property of the taxpayer subject to a mortgage or other lien, the amount of indebtedness secured by such mortgage or lien shall be considered as an indebtedness of the taxpayer whether or not the taxpayer assumed or agreed to pay such indebtedness * * *."

The Tax Court upheld the Commissioner's determination that the Jameson note was not an "indebtedness incurred in good faith for the purposes of the business" and that therefore it could not constitute an item of "borrowed capital" for purposes of calculating the excess profits tax credit. We agree with the decision of the Tax Court on this issue and with its reasons therefor as set out in the margin.[14]

14. "It is first urged that the two sentences of section 439(b) (1) create separate and unrelated tests or definitions of borrowed capital. Under this theory, Mel Dar asserts that the Jameson note qualifies under the terms of the second sentence, regardless of the presence or absence of the good faith business purpose cited in the first sentence.

"We think such a construction untenable. The first sentence of section 439 (b) (1), which Mel Dar seeks to avoid, expressly mentions, inter alia, a mortgage. The second sentence, referring to property 'subject to a mortgage or other lien,' must necessarily be read in pari materia therewith. Moreover, it would be absurd to ascribe to Congress an intent to permit a secured indebtedness to qualify ipso facto, while, at the same time setting forth a test of good faith business purposes for all other debts.

*     *     *     *     *

"It is clear that no business purpose can be related to the economic value of the mortgaged shares. The quoted price for unencumbered shares of Cement on the San Francisco Stock Exchange was

The remaining contentions of the petitioners are without merit.

The cases are remanded to the Tax Court for proceedings not inconsistent with the foregoing opinion.

See also 204 F.Supp. 884.

$5 and all other shares of this stock acquired by Mel Dar on June 1 and June 5, 1950, were carried on its books at that value. Petitioners have failed to prove any higher figure, thus the unencumbered value of the mortgaged shares was only about one-half of the indebtedness. In addition, the dividends on this mortgaged stock were payable to the Jameson Corporation; thus, Mel Dar received neither a valuable equity nor property productive of income.

"Mel Dar next contends that the business purpose for its acquisition of the stock was to acquire control of Cement. But the purpose of the Jameson loan when originally made in 1934 was to assure continued control of Cement by Burnett, and this was effectively accomplished at that time. In June 1950 Mel Dar acquired 106,724 of the 188,164 outstanding shares of Cement. It purchased in addition 212 shares, 806 shares and 2,326 shares in its fiscal years 1951, 1952, and 1953, thus, absent the 16,208 mortgaged shares, it would never have owned a full 50 per cent of the outstanding shares. But we cannot simply assume that 50 per cent ownership or any other given percentage was necessary to control. Petitioners have failed to show that a loss of 16,208 shares would in fact spell the end of control over Cement by the Burnett interests. There is no showing that de facto control of Cement required an actual majority of outstanding shares, or that the Burnetts, individually, did not hold sufficient shares in Cement to offset any loss of control resulting from loss of the 16,208 shares in question.

"In summary, we hold that respondent did not err in excluding the Jameson note."