**WASHINGTON FEDERAL SAVINGS AND LOAN ASSOCIATION OF MIAMI BEACH, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 67–1266–Civ.**

United States District Court
S. D. Florida.

Sept. 26, 1969.

Cyrus A. Neuman, Miami, Fla., for plaintiff.

Myron C. Baum and Eugene P. Kopp, Attys., Dept. of Justice, Tax Division, Washington, D. C., and Robert Steuer, Asst. U. S. Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION

FULTON, Chief Judge.

The Plaintiff, Washington Federal Savings and Loan Association of Miami Beach (hereinafter referred to as "Washington Federal"), instituted this action against the United States for a refund of income taxes in the amount of $100,446.91 for the year 1963. Washington Federal claims that said amount was collected from it erroneously in that the Commissioner failed to allow it to deduct, as an ordinary and necessary business expense, the amount which Washington Federal was required to pay and did pay as an additional insurance premium to the Federal Savings and Loan Insurance Corporation (hereinafter referred to as "FSLIC"). This Court has jurisdiction over the parties to and the subject matter of this cause by virtue of 28 U.S.C. § 1346(a).

At the Court's pretrial conference of this cause, counsel for Washington Federal and the Government announced that all of the evidentiary facts which are relevant to the resolution of this controversy had been stipulated, that the case was being submitted to the Court upon the Pretrial Stipulation and comprehensive documentary exhibits annexed thereto, and that there remained no further evidence to be adduced at a trial. The Court has carefully examined and considered the Stipulation and its exhibits and finds that, as represented by

counsel, the only issue remaining to be resolved by the Court is whether the additional insurance premium paid by Washington Federal to FSLIC in 1963 was an ordinary and necessary business expense in 1963.

Washington Federal, whose principal place of business is in Miami Beach, Florida, is a Federal Savings and Loan Association chartered under the laws of the United States by the Federal Home Loan Bank Board in 1952. As a Federal Savings and Loan Association, it is required by law to apply for insurance of its accounts with FSLIC and to pay a certain premium for that insurance. 12 U.S.C. § 1726(b) and 12 U.S.C. § 1727 (b) (1). These insurance premiums paid to FSLIC are credited to FSLIC's Primary Reserve and must be paid annually until the Primary Reserve equals or exceeds 2% of the total amount of all accounts of insured members and creditor obligations of all insured institutions. 12 U.S.C. § 1727(b) (2). They are conceded by the Government to be ordinary and necessary business expenses of the savings and loan association. Washington Federal paid the sum of $40,608.35 to the FSLIC's Primary Reserve in 1963, deducted that sum as an ordinary and necessary business expense, and the deductibility of the Primary Reserve payment is not here in controversy.

However, in addition to the Primary Reserve payment, Washington Federal was required by law to pay, and did pay to the FSLIC in 1963 an additional premium in the amount of $448,396.12. Washington Federal contends that it erroneously failed to deduct on its 1963 income tax return the amount it paid as said additional insurance premium, and that it should have deducted said additional insurance premium as an ordinary and necessary business expense under Section 162(a) of the Internal Revenue Code. Thus, it is the deductibility in 1963 of this additional insurance premium which is here in controversy.

In 1961, Title IV of the National Housing Act was amended in order to build up FSLIC's reserves at a faster rate. The 1961 Amendment requires that each insured institution pay to FSLIC "[an] additional premium in the nature of a prepayment with respect to future premiums" in an amount equal to 2% of the net increase in all accounts of its insured members, reduced by an amount equal to any requirement for the purchase of stock of the Federal Home Loan Bank of which such institution is a member. 12 U.S.C. § 1727(d). This additional premium is to be credited to FSLIC's Secondary Reserve, which Reserve is to be available to FSLIC to meet losses only to the extent that FSLIC's other available accounts are insufficient to meet such losses. There is to be credited to the Secondary Reserve a pro rata return on the Secondary Reserve's balances at a rate equal to FSLIC's return on investments in obligations of the United States. 12 U.S.C. § 1727(e).

FSLIC has maintained an account in Washington Federal's name, which account has shown Washington Federal's pro rata share of the Secondary Reserve and earnings credited thereto. However, Washington Federal may not assign or transfer its pro rata share of the Secondary Reserve except as FSLIC may provide in case of its merger, consolidation, transfer of bulk assets or other similar transaction. 12 U.S.C. § 1727(e). There is a possibility that Washington Federal may at some future date cease making these payments and recoup its pro rata share of the Secondary Reserve, if and only if one of the following events transpires, none of which has transpired to date:

(a) Its status as an insured institution is terminated, 12 U.S.C. § 1727 (f) (i);

(b) A conservator, receiver, or other legal custodian is appointed for it, 12 U.S.C. § 1727(f) (ii);

(c) FSLIC makes a determination that it has gone into liquidation, 12 U.S.C. § 1727(f) (iii);

(d) If the aggregate of the Primary and Secondary Reserves equals or exceeds 2% of the total amount of all

accounts of insured members and creditor obligations but the Primary Reserve alone does not equal or exceed that 2%, then Washington Federal's duty to make the additional payments ceases and its pro rata share of the Secondary Reserve is used to make such payments, 12 U.S.C. § 1727(g);

(e) If the Primary Reserve alone equals or exceeds the 2%, then Washington Federal's pro rata share of the Secondary Reserve will be paid to it in cash, and its obligation to make the additional payments will cease. 12 U. S.C. § 1727(g).

The General Accounting Office is required by law to audit the FSLIC and the Comptroller General of the United States is required to report thereon to the Congress. (Sec. 850 et seq., of Title 31, U.S.C.) In such a report dated December 1961, the General Accounting Office stated as follows: "The Corporation states that the insurance reserve is not a measure of the insurance risk which is dependent on future economic conditions. Under these circumstances, we are unable to express an opinion as to the adequacy of the insurance fund reserve to meet future losses." Similar comments and similar refusals to express an opinion on the adequacy of the FSLIC reserves were made by the General Accounting Office in reports dated January 1963, October 1964 and May 1967.

In 1963, plaintiff listed its additional premium payment as an asset on its books, on its published balance sheets and on its reports to the Federal Home Loan Bank Board, and to the public; and on June 6, 1967, plaintiff timely filed a claim for refund which asserted that the $448,396.12 additional premium which it paid to FSLIC in 1963 pursuant to 12 U.S.C. § 1727(d) should have been deducted as an ordinary and necessary business expense, thus entitling plaintiff to a tax refund in the amount of $100,446.91. The parties have stipulated that in the event that the Court holds the payment to be deductible, the proper amount of such deduction for the year 1963 is $448,396.12, the amount actually paid by plaintiff in May 1963.

As stated previously, the Government does not dispute the deductibility as ordinary and necessary business expenses of premium payments to the FSLIC Primary Reserve. However, the Government does dispute the deductibility of the additional premium payments to the FSLIC Secondary Reserve, and its position is stated in Revenue Ruling 66–49, 1966–1 CB, pg. 36:

"The additional premium prepayments which an insured savings and loan association is required to pay to the Federal Savings and Loan Insurance Corporation under the provisions of Section 404 of the National Housing Act, as amended, are not deductible when paid and may be deducted only when any possibility of their return is precluded."

The Government takes this position based upon several alternative theories:

(1) That the additional premium payment is a non-deductible capital expenditure;

(2) That said payment is a non-deductible deposit for contingent losses;

(3) That said payment is not a premium for insurance.

In promulgating the above Revenue Ruling and advancing these theories, the Government argues that because Washington Federal retains an identifiable interest in the FSLIC Secondary Reserve, which interest is returnable to Washington Federal under certain circumstances, the additional premium payment is not deductible. With that interpretation, this Court does not agree.

Plaintiff takes the position that the additional premiums do not differ in any really material respect from the regular premiums and are deductible in the same manner as the regular premiums. Plaintiff's position is supported by the case of First Federal Savings and Loan Association of St. Joseph v. United States (U.S.Dist.Ct., W.Dist. of Mo.,

1968) 288 F.Supp. 477, which decided the identical issue in favor of the taxpayer.

It is the view of this Court that the only significant difference between the regular premiums and the additional premiums is the fact that there exists a contingent possibility that the additional premiums may some day be recovered. For reasons which will appear below, this fact does not render the additional premiums non-deductible. In all other respects, the regular and additional premiums are substantially identical and, in fact, the additional premiums are for all practical purposes nothing more than an increase in the amount of the regular premiums.

Plaintiff's purpose in paying the additional premiums is the same as its purpose in paying the regular premiums. It is required by law to insure its accounts and it must pay both premiums in order to maintain the insured status of its accounts. If it fails or refuses to make either the additional or regular premium payments, the FSLIC would terminate its insured status, acting under the provisions of its Regulations, 12 CFR Sec. 565.2.[1] There is no distinction in those Regulations between failure to make one payment as opposed to the other. Therefore, with respect to both regular and additional premiums, there exists precisely the same compulsion to pay, the same purpose in paying, and the same consequence of failure to pay. Likewise, in the hands of the FSLIC, the regular premiums (after deducting the portion used for operating expenses) and the additional premiums serve identical functions. They are held as a reserve against losses. While two separate reserves are established—Primary Reserve and Secondary Reserve—there is no difference in function between the two reserves, both of which are established for the single purpose of meeting future losses.

The sole apparent purpose of Congress in establishing two separate reserves instead of one was merely to provide a mechanical vehicle for the identification and return of unused additional premiums in the event that the aggregate reserves of the FSLIC become sufficiently large to justify it. This possibility of return or recovery was made contingent by Congress upon the aggregate of the two reserves equaling 2% of the total amount of all insured accounts and creditor obligations of all insured institutions. At such time, the unused portions, if any, of plaintiff's additional premiums will be used in succeeding years to pay plaintiff's regular premium obligations. Such event, when and if it ever takes place, will constitute, in effect, a recovery by plaintiff of such portion of its additional premiums.

It is apparent that attempts to predict the day when such a turn of events will occur, if indeed it ever occurs, lie in the realm of pure speculation. The General Accounting Office has four times refused to express an opinion on the adequacy of the FSLIC reserves, because of the uncertainty of future losses. Future losses depend entirely on the incidence of prosperity or recession in the country. Really substantial losses will wipe out the FSLIC reserves and eliminate plaintiff's possibility of recovery. Equally important, consistent moderate losses, while not exhausting the reserves, will have the effect of preventing the reserves from ever building up to the 2% ratio necessary for a recovery.

---

1. Sec. 565.2 *Termination by the Corporation.*

   (a) *Grounds for termination.* Any one or more of the following shall constitute grounds for termination by the Corporation of the status of an insured institution as an insured institution:

   (1) The institution has violated its duty as an insured institution;

   (2) * * *

   (3) * * *

   (4) The institution is violating or has violated an applicable law, rule, regulation, or order,

    *    *    *    *    *

The right of recovery thus available to plaintiff was at the time of payment in 1963, and still is, nothing more than a mere contingent and remote possibility. As such, it cannot have the effect for tax purposes of destroying the deductibility of the additional premium. In order to operate its business, plaintiff was required to pay the additional premium. It was paid with respect to insurance coverage, it covered a certain risk and the proceeds were subject to payment of losses with respect to that risk. Thus, this was an expense which in all respects qualified as an ordinary and necessary business expense.

The principle that otherwise deductible payments are not rendered nondeductible merely because of a contingent possibility of recovery has been repeatedly enunciated by the courts. In Electric Tachometer Corporation (1961), 37 T.C. 158, the court stated:

"* * * an otherwise proper deduction should not be disallowed in the year in which it is paid or incurred because of the existence of a possibility that at some future date the taxpayer might receive a reimbursement therefor."

To the same effect are George K. Herman Chevrolet, Inc. (1963), 39 T.C. 846; Allegheny Corporation (1957), 28 T.C. 298; Burnet v. Hutchinson Coal Co. (CA 4–1933), 64 F.2d 275; Mel Dar Corp. v. Commissioner of Internal Revenue (CA 9–1962), 309 F.2d 525; I.T. 2764 (Cum.Bull. XIII–1, 1934) and I.T. 3632 (1943 Cum.Bull., p. 114).

The Fifth Circuit Court of Appeals has enunciated the same rule in Wichita State Bank and Trust Co. v. Commissioner of Internal Revenue (C.A. 5–1934), 69 F.2d 595, in dealing with the special assessments, paid by that taxpayer. The court stated:

"Prima facie it is an expense * * *. There may be a return, but it will be deferred long beyond the tax year and is wholly uncertain. Taxation being a practical matter, payment of such an assessment may well be treated as a present expense, and any return that may come from it in future years as a windfall or a profit."

The above cases and rulings are all predicated upon the principle that taxes must be fixed and accounted for on an annual basis, Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383, with the consequent "denial both to government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment." Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725. The cited authorities accordingly hold the payments deductible in the year of payment, notwithstanding the contingent possibility of recovery, and hold further that if and when the deducted payment should happen to be recovered in a later year, it will constitute income in the year of recovery. Likewise, in the instant case, in the event that plaintiff should ever recover its 1963 additional premium payment, it will realize income in the year of recovery.

The Government makes the argument that in making the additional premium payment plaintiff acquired a capital asset and, hence, has no right to a deduction. The Court finds this argument unacceptable. The argument might have merit if plaintiff had it within its power and control to recover the payment. Such is not the case. The possibility of recovery depends on circumstances which cannot be influenced by plaintiff and which are wholly beyond its ability to control.

The statute, after prohibiting any transfer or assignment by any institution of its share of the Secondary Reserve, spells out three circumstances under which the additional premium may possibly be recovered. The first circumstance is that discussed above, to-wit: the increase in the aggregate of the Primary and Secondary Reserves of the FSLIC to the point where they equal 2% of the total amount of all

accounts and creditor obligations of insured members. Obviously, this event is beyond plaintiff's control. The second circumstance spelled out by the statute is the termination of plaintiff's insured status. This circumstance can never take place, since plaintiff is required by law to carry the insurance. The third circumstance is the liquidation of the institution. This circumstance has no practical significance. Aside from the fact that plaintiff cannot voluntarily liquidate, but must have explicit approval of the Federal Home Loan Bank Board, 12 CFR, Secs. 546, 547, liquidation would, by definition, terminate plaintiff's existence. The Court, therefore, concludes that plaintiff did not acquire a capital asset.

Bearing directly on the question of the ability of a taxpayer to control the recovery of its insurance premiums is the decision of the Eighth Circuit Court of Appeals in United States v. Weber Paper Co., (CA 8–1963), 320 F.2d 199. In that case, the taxpayer made annual insurance premium payments to a reciprocal flood insurance exchange. Ninety-nine per cent of such payments were placed by the exchange in a Catastrophe Loss Account which was available to cover flood losses of the subscribers. At the end of each policy year, the subscribers could, merely by giving sixty days' written notice, withdraw the entire amount of their premium payments which had been placed in the Catastrophe Loss Account, provided that the account had not been used up by flood losses of other subscribers. In addition, subscribers were permitted to withdraw portions of their accounts prior to the close of the policy year to pay tax deficiencies and some subscribers were permitted to assign their accounts as collateral for loans. The Government disallowed the deduction on the ground that the taxpayer "never realistically lost control of its premium deposits". The Eighth Circuit Court of Appeals sustained the deduction, expressly approving the conclusions of the District Court. The District Court had stated that the Government contentions were:

> " * * * inapplicable to the case at bar since they ignore the fact that the deposits pass from the control of the taxpayer, and that no portion thereof can be withdrawn by the taxpayer during the policy year in which they were paid." (204 F.Supp. 394)

Thus, the Eighth Circuit Court of Appeals declined to hold that the taxpayer had acquired a recoverable capital asset, notwithstanding the fact that the taxpayer could without restriction freely withdraw 99% of its payment within sixty days after the close of the policy year. The case before this Court is obviously substantially stronger for the taxpayer, since plaintiff can make no withdrawal of any kind at any time.

The Government relies upon the case of *Wichita State Bank and Trust Co., supra,* insofar as its holding relates to the regular annual contribution by the member banks in the Texas Deposit Guaranty Fund.[2] The Court finds this decision to be sharply distinguishable from the case before it. The member banks in Texas had the right to protect their depositors in either of two ways. They could either take out a bond, or they could become members of the State Depositors' Guaranty Fund. If they chose the latter method, which the taxpayer did, they could withdraw and switch over to the bond system at any time, and receive the return of their previously made regular annual contributions. The taxpayer involved did in fact withdraw and switch to the bond system and did in fact receive the return of its previous regular annual contributions. The court held that the contributions when made had merely constituted capital investments and were not deductible. Unlike the taxpayer in the *Wichita* case, plaintiff has not recovered its additional premium payments, and unlike the *Wichita* taxpayer,

2. Another portion of the holding of the *Wichita* case, relating to the special assessments, is cited earlier in this opinion.

it has absolutely no ability or power to recover them. The *Wichita* case is, therefore, inapposite.

The Government argues that the annual "return" credited to plaintiff's share of the Secondary Reserve gives it the character of an income producing capital asset. However, it is apparent that the return is entirely illusory. The earnings credited to the reserve are not available to plaintiff in any manner. They are simply added to the balance of the reserve and are precisely as far beyond plaintiff's reach or recall as is the principal balance itself. It should be noted that in the very same Revenue Ruling in which the Commissioner disputes the deductibility of the additional premium payments, he concedes that the earnings thereon which are credited to Washington Federal's Secondary Reserve account are not yet includible in its gross income. This is precisely because the very same substantial restrictions limit the availability of these earnings to Washington Federal as restrict the availability of the principal of the Secondary Reserve. Revenue Ruling 66–49, *supra*.

█ █   The Government also stresses the fact that plaintiff carried its additional premium payment as an asset on its books, its reports and its published balance sheets, rather than listing it as an expense. However, it should be noted that plaintiff, as a member of the Federal Home Loan Bank system, is required by the Federal Home Loan Bank Board to report its pro rata share of the Secondary Reserve as an asset, and must do so in order to operate its business as a Federal Savings and Loan Association. Compliance with the rules and regulations of the Federal Savings and Loan System is not determinative of characterization of an expenditure for tax purposes. Citizens Federal Savings and Loan Association of Covington v. Commissioner, 30 T.C. 285 (1958); Old Colony Railroad Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484; Revenue Ruling 57–26, IRB 1957–2, p. 180. Moreover, the label or book entry given to an ex-

penditure does not control its deductibility as an expense, Burnett v. Commissioner of Internal Revenue, 356 F.2d 755 (5 Cir. 1966), because commercial or business accounting is just not always or necessarily the same as tax accounting. Patchen v. Commissioner of Internal Revenue, 258 F.2d 544, 550 (5th Cir. 1958).

The Court is not convinced that payment of the additional premium is analogous to Washington Federal's payments for acquisition of capital stock in a Federal Home Loan Bank. This was a premium paid to FSLIC for insurance protection against certain risks, and the entire sum paid by Washington Federal to the FSLIC Secondary Reserve was subject to being consumed in order to pay losses.

In reaching the conclusions set forth in this Memorandum Opinion, the Court is not unmindful of the recent Tax Court opinion in the case of Lincoln Savings and Loan Association v. Commissioner, 51 T.C. 82, October 21, 1968. However, for the reasons previously set forth, this Court respectfully declines to follow its holding and the premises upon which that holding is based. One of those premises which has not been previously dealt with in this opinion is the Tax Court's holding that the additional premiums do not provide "insurance coverage" in the year of payment. It is the view of this Court, on the contrary, that the compulsion to pay, purpose in paying, and consequence of failure to pay are precisely the same for the additional premiums as for the regular premiums and that the additional premiums provide insurance coverage in the same manner and to the same extent as the regular premiums. On the same point, the Tax Court also states that payment of the regular premium "gives rise to an obligation" by the insurer to provide insurance coverage, but upon its receipt of an additional premium payment, "the FSLIC incurs no such obligation". It is the view of this Court, on the contrary, that neither premium payment gives rise to FSLIC's

obligation to provide insurance coverage. That obligation is created by statute. As long as the institutions to whom certificates of insurance are issued comply with their duties under the statute—in this case the duty to make both regular and additional premium payments—the statutory obligation of the FSLIC to provide coverage continues.

In *Lincoln Savings* the Tax Court also stresses the reduction by Congress of the amount of Federal Home Loan Bank stock required to be owned by members, and the reduction of the additional premium payments in years when Federal Home Loan Bank stock must be purchased, as indicating Congressional intent to channel funds from one capital investment to another. It is the view of this Court that no imagined Congressional intent along such lines can be inferred from Congressional actions which are nothing more than relief measures designed to alleviate the financial burden of the savings and loan institutions. Additionally, the *Lincoln* case involved a State savings and loan association, not, as here, a Federal savings and loan association. State institutions are not required by law to maintain insurance. Theoretically, therefore, the taxpayer in *Lincoln* could have discontinued its insured status and thereby received the return of its additional premiums. Plaintiff, on the other hand, is a Federal association and is required by Federal law to maintain the insurance. Hence, it can never discontinue it and has no power or control over the recovery of its additional premium payment. The *Lincoln* case is, therefore, distinguishable in any event.

This Court does agree with the Tax Court that these payments were not "security deposits in the nature of a reserve for contingent liabilities." Cf. Spring Canyon Coal Co. v. Commissioner of Internal Revenue, 43 F.2d 78, 76 A.L.R. 1063 (10th Cir. 1930). For the reasons herein set forth, this case is also distinguishable from those cases in which the taxpayer set aside upon its own books a reserve to meet future contingent expenses or liabilities, such as Wayne Title & Trust Co. v. Commissioner of Internal Revenue, 195 F.2d 401 (3rd Cir. 1952); and Spring Canyon Coal Co. v. Commissioner of Internal Revenue, *supra*.

In view of all of the foregoing, this Court concludes, as did the Court in First Federal Savings and Loan Association of St. Joseph v. United States, *supra*, that the portion of Revenue Ruling 66–49 which concerns deductibility of the additional premium payments as an ordinary and necessary business expense is not reasonable. The Court specifically finds and concludes that the $448,-396.12 additional premium paid by Washington Federal to FSLIC in 1963 is deductible as an ordinary and necessary business expense in 1963.

This Memorandum Opinion shall serve in lieu of separate findings of fact and conclusions of law in this case. Counsel for Washington Federal is hereby directed to submit an appropriate judgment form in conformity with this Memorandum Opinion within ten (10) days of the date of entry hereof.