**YOUNG & RUBICAM, INC.**

v.

**The UNITED STATES.**

Nos. 135–64, 59–65.

United States Court of Claims.

May 16, 1969.

**1234**

Sandow Holman, New York City, attorney of record, for plaintiff, James R. Zuckerman, New York City, of counsel.

Ira M. Langer, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant, Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

### OPINION

LARAMORE, Judge: [1]

These two cases, consolidated for trial, involve claims for refund of Federal income taxes for the years 1959 and 1960. There are common questions of fact and law.

Plaintiff, Young & Rubicam, Inc., claims a refund of an alleged overpayment of tax for the year 1959 caused by the disallowance of deductions for compensation and related business expenses. Similarly, it claims a refund of an alleged overpayment for the year 1960 caused by the disallowance of compensation and related expenses and also by the Commissioner of Internal Revenue's determination that additional taxable income was allocable to plaintiff from the gross income of its foreign subsidiaries (as compensation to plaintiff for the management and administrative services it allegedly performed for these subsidiaries.)

Two separate problems are presented. Firstly, may plaintiff deduct salaries and other related compensation paid to personnel assigned (on a full-time basis, with residence abroad) to positions with plaintiff's foreign subsidiary corporations (generally for temporary periods of time ranging from six months to two years) as its own section 162 expense,[2]

---

1. "We are indebted to Trial Commissioner William E. Day for his opinion, findings of fact and recommended conclusion of law. We have adopted much of what the commissioner has written and arrive at similar conclusions for different reasons.

2. United States Code, 1964 Ed., Title 26, § 162:

"§ 162. Trade or business expenses.

"(a) In general.

"There shall be allowed as a deduction all the ordinary and necessary expenses

or are these salaries expenses of the foreign subsidiaries? Both tax years involve this issue. Secondly, has plaintiff proved that the Commissioner acted arbitrarily and capriciously by incorrectly allocating additional income to the taxpayer? This question relates only to the year 1960.

The precise facts proved are determinative and we summarize the detailed facts presented in our findings, as follows:

Plaintiff is engaged in the advertising business. It commenced its operations in 1923 in Philadelphia, Pennsylvania. It enjoyed immediate success and within a short time moved its offices to New York City, in order to be closer to its major clients. With its principal office in New York City, branch offices were opened by plaintiff in Chicago, Detroit, Los Angeles, Hollywood and San Francisco, as its business volume increased. In terms of the dollar volume of gross billings, it is now the third largest advertising firm in the United States. Its clients include many large United States corporations.

In 1934, at the urging of plaintiff's United States clients who were marketing their products in Canada (through Canadian subsidiaries), plaintiff organized a Canadian subsidiary corporation with offices in Montreal. Thereafter, the principal office of this subsidiary was transferred to Toronto.

With the end of World War II came a major expansion of marketing by United States firms into foreign countries. This was carried out directly and through subsidiary firms. United States advertising firms likewise opened offices abroad to provide advertising services for United States firms and their subsidiaries. The plaintiff, in line with this trend, also opened several offices abroad.

As early as 1944, one of the most important of plaintiff's clients asked it to open a London office in order to assist in carrying out an advertising program for products which a foreign subsidiary was marketing and for other products that it expected to sell. Plaintiff formed a British subsidiary corporation under the name of Young & Rubican, Ltd., with offices in London. In 1960, the plaintiff owned 62.6 percent of the stock of this corporation. The remainder of the stock of this subsidiary corporation was owned by employees of the British corporation. Plaintiff believed that if it did not enter the London advertising market, competitors would move in and take over the London advertising of its domestic clients and possibly thereby acquire the domestic advertising account of these clients.

In 1945, plaintiff opened an office in Mexico City, Mexico by forming a new subsidiary, Young & Rubicam, Mexico, S.A. In 1960, plaintiff owned 96.6 percent of the stock of this corporation. Plaintiff entered this market to keep pace with the expanding international marketing activities of its domestic clients and their foreign subsidiaries and, in addition, to expand its own organization into a world-wide advertising firm. There was no specific request from a client to enter this market, as had been the case in the London market.

In 1955, the plaintiff acquired an advertising agency in Puerto Rico. It thereafter organized a corporation— Young & Rubicam (Puerto Rico) Corp. —and continued this operation under that name. In 1960, plaintiff owned 100 percent of the stock of this corporation.

In 1957, the plaintiff opened a branch office at Caracas, Venezuela. This office continued as a division of the plaintiff company until 1960, when a wholly-owned Venezuelan corporation was formed to conduct this business.

paid or incurred during the taxable year in carrying on any trade or business, including—

"(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

"(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *."

In 1955, the British subsidiary organized a subsidiary in Frankfurt, Germany. In 1959, a Swiss subsidiary was organized by the British corporation—this was known as Young & Rubicam, S.A. (Geneva). It provided only marketing studies or services for plaintiff's United States clients and had only three employees. Both the German and the Swiss subsidiary corporations were wholly-owned by the British corporation. Plaintiff has not shown that specific clients requested it to open any of the above offices.

As noted above, Young & Rubicam, Ltd. (Toronto) was formed in 1934. During 1960, 79.5 percent of its stock was owned by Young & Rubicam, Inc.

During the year 1960, plaintiff's ownership or control of the aforementioned foreign subsidiaries may be summarized as follows:

| Company | Percent | Owned by |
|---|---|---|
| Young & Rubicam, Ltd. (London) | 62.6 | plaintiff |
| Young & Rubicam, G.m.b.H. (Frankfurt) | 100.0 | Y & R, Ltd. (London) |
| Young & Rubicam, S.A. (Geneva) | 100.0 | Y & R, Ltd. (London) |
| Young & Rubicam, Ltd. (Toronto) | 79.5 | plaintiff |
| Young & Rubicam, Mexico, S.A. (Mexico City) | 96.6 | plaintiff |
| Young & Rubicam (Puerto Rico) Corp. (San Juan) | 100.0 | plaintiff |
| Young & Rubicam de Venezuela, S.A. (Caracas) | 100.0 | plaintiff |

In 1959 and 1960 each of the corporations (except Young & Rubicam, S.A. of Geneva) operated a fully staffed advertising agency with a complement of employees in each of its principal operating departments: executive, accounting, art, copy, contact, marketing, media, production, research, traffic, television, etc. Each subsidiary had the facilities for and capability of performing every phase of its own advertising business. The number of employees on the payroll of each subsidiary during 1960 was as follows:

| Subsidiary | Employees |
|---|---|
| Young & Rubicam, Ltd. (London) | 322 |
| Young & Rubicam G.m.b.H. (Frankfurt) | 69 |
| Young & Rubicam, S.A. (Geneva) | 3 |
| Young & Rubicam, Ltd. (Toronto & Montreal) | 177 |
| Young & Rubicam, Mexico, S.A. (Mexico City) | 41 |
| Young & Rubicam (Puerto Rico) Corp. (San Juan) | 38 |
| Young & Rubicam de Venezuela, S.A. (Caracas) | 49 |

Plaintiff maintained close supervision over the operations and finances of its subsidiaries. Periodic visits to the subsidiaries were made by plaintiff's financial and accounting officers in carrying out this supervision. They did not assist the subsidiaries nor was assistance needed, since each subsidiary had its own accounting and financial staff.

Certain employees were sent abroad for extended periods to assist the subsidiaries. While abroad, they were paid all or part of their compensation by the plaintiff, together with travel expenses,

moving and living costs and related entertainment and other expenses.

In the audit of plaintiff's 1959 return, the Internal Revenue Service disallowed deductions for these amounts paid to personnel who were employed in foreign countries. Additional tax was assessed against plaintiff, paid by it and was the subject of a timely claim for refund. The amounts are shown in detail in finding 53.

The audit resulted in the disallowance of the deductions for salaries and expenses of some but not all of the individuals now involved in the section 162 deduction issue. (By its amended answer, the government has raised a set-off issue as to the deductibility of the remainder of the 21 individuals whose salaries and expenses for 1959 are in question.)

In the audit of plaintiff's 1960 return, the Commissioner again disallowed the section 162 deductions for salaries and expenses and, in addition, he concluded that pursuant to section 482, $124,789 should be allocated to plaintiff as additional income from its subsidiaries for services rendered by plaintiff.

The 90-day letter to plaintiff explained this allocation as follows:

(b) It has been determined that you realized additional taxable income in the amount of $124,789.00 which has been allocated to you from the gross income of various of your controlled foreign subsidiaries for management and administrative services performed for them. * * *

It also explained that $325,754.86 was disallowed under section 162 "inasmuch as you [plaintiff] have not established same as allowable under any of the sections of the Internal Revenue Code." The disallowance of these items (together with other disallowances not here in issue) resulted in the assessment of a deficiency for 1960 which was paid and for which a timely claim for refund was filed.

Both claims for refund were denied by the Commissioner. It was admitted by the defendant at trial, however, that an item of $6,070.85 (relating to the cost of an annual Christmas party for its employees) disallowed in the 1959 return is properly allowable. A concession was likewise made during the trial, that the $25,000 accrued for contributions to a scholarship fund in that year was properly deductible.

In addition, the defendant (at trial) conceded that the $40,000 compensation paid to Wilkerson ($13,000 for the period January 1, 1960 through April 19, 1960 and $27,000 for the period April 20, 1960 through December 31, 1960) was properly deductible and, therefore, should not have been disallowed. The defendant further conceded that as to entertainment, travel and a few small miscellaneous payments made to seven other employees, such payments were properly deductible as ordinary business expenses and should have been allowed as deductions in 1960 by the Commissioner.

The trial commissioner found that plaintiff had not offered any proof as to non-employee payments totaling $4,276.-84. We adopt that conclusion.

We find that plaintiff is entitled to deduct some of its claimed section 162 expenses and that it should recover a refund of the deficiency assessed on the basis of the section 482 allocation.

## I. Section 162

Our concern is whether plaintiff or one of its subsidiary corporations, in substance, has actually received the benefit of (and therefore incurred and may deduct) a particular expense. Business expenses which satisfy the ordinary and necessary expense requirements of section 162 are deductible if they are "proximately connected to the business of the taxpayer claiming deduction therefor * * *." Eustice, Tax Problems Arising from Transactions Between Affiliated or Controlled Corporations, 23 Tax L. Rev. 451, 475. Clearly, expenses incurred for the benefit of another taxpayer cannot be deducted under section 162. *See e. g.*, Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607

(1943); Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). Under unique circumstances, to be discussed below, a section 162 deduction may be allowable if, for its own benefit, a taxpayer pays the expense of another.

The Commissioner of Internal Revenue has challenged plaintiff's deductions for salaries, bonuses, profit-sharing and group insurance payments, travel and entertainment expenses, moving expense reimbursements and living expenses (a form of additional compensation) paid to 19 enumerated individuals.[3] Plaintiff argues that these men were its employees and that their efforts while stationed abroad were for its direct and proximate benefit. Alternatively, plaintiff contends that even if their activities directly benefitted the foreign subsidiaries, plaintiff may deduct these expenses as its ordinary and necessary section 162 expenses because they were incurred with the underlying, motivating purpose of protecting and promoting its *domestic* advertising business.

### A. Compensation and related payments

Plaintiff, Young & Rubicam, Inc., is in the business of representing advertisers in United States' media. In addition, its International Division prepares special advertising materials for use in the media of countries where it does not have a subsidiary capable of preparing the material.

Each subsidiary corporation has its own trade or business, *i.e.*, preparing advertising copy for use in the media of the foreign country where it is located. Certain major companies might employ both Young & Rubicam, Inc. as their U. S. representative and one or more of plaintiff's subsidiary corporations as their representative for a particular foreign market; or an advertiser might be a subsidiary corporation's client, but not a client of Young & Rubicam, Inc.

■ Plaintiff's right to recover a refund turns on questions of fact. Under its first argument, plaintiff must prove that the specific services performed by each of the employees involved were for its direct and proximate benefit. The general and indirect benefit which obviously inures to a parent corporation when one of its subsidiaries successfully performs its functions does not satisfy the requirements of section 162.

■■ In refund litigation, the taxpayer has the burden of proof because he is the plaintiff and because the government benefits from the presumptive correctness of the Commissioner's administrative determination. *See, e.g.,* United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); United States v. Mitchell, 271 U.S. 9, 46 S. Ct. 418, 70 L.Ed. 799 (1926); Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); Oliver v. Commissioner of Internal Revenue, 364 F.2d 575 (8th Cir. 1966); Parmelee Transportation Co. v. United States, 351 F.2d 619, 173 Ct.Cl. 139 (1965); Forbes v. Hassett, 124 F.2d 925 (1st Cir. 1942); First Trust & Deposit Co. v. Shaughnessy, 134 F.2d 940 (2d Cir. 1943); cert. denied, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442. In general, the taxpayer must prove the nature and details of the expenditures made to obtain a deduction. The issues must be decided upon the basis of the circumstances proved in each case.

The decision in Columbian Rope Company, 42 T.C. 800 (1964) Acq. 1965–1 C.B. p. 4 (as to other issues), provides some guidance. The Tax Court approved the parent corporation's deduction for salaries paid to its executives who supervised and controlled its subsidiary operations, as ordinary and necessary section 162 expenses. The salaries of those executives who were held to be employed by the foreign (subsidiary) corporation

---

3. As a set-off issue, defendant has raised the deductibility of expenses paid to two individuals not included in the Commissioner's deficiency assessment.

were held non-deductible by the parent. The court said:

> We believe the record clearly shows that *petitioner undertook these payments simply to aid its wholly owned foreign subsidiary to obtain the services of needed management personnel.* A successful operation of the foreign subsidiary, through the services of such personnel, would obviously inure to the benefit of the petitioner as parent corporation. Petitioner's willingness to undertake this obligation is understandable. But we do not believe that these dollar payments of salaries and related payments can be construed as petitioner's own business expense * * *. [42 T.C. 815–816; emphasis added.]

 Plaintiff cannot claim as its own expense, compensation paid for activities that were concerned with the day-to-day operation of the subsidiary corporation's business. Any benefit to plaintiff from these activities cannot be considered proximate and direct to its own business and, therefore, these expenses are not allowable deductions under section 162.

It is to the proof of each individual's activities, as presented by the record, that we now turn. We have concluded that some of the individuals performed no activities that directly benefitted plaintiff (in which case the deduction has been disallowed), that none of the employees performed services exclusively for plaintiff's benefit, and that many employees performed specific, but different, services both for a subsidiary and plaintiff. A deduction is allowable insofar as plaintiff has proved that a particular individual was involved in a specific activity clearly for plaintiff's proximate and direct benefit; *e. g.,* plaintiff's foreign expansion program, marketing surveys and advice for plaintiff's clients who planned to enter foreign markets (other than the specific market covered by the subsidiary wherein the individual was employed, because in that situation he would have been soliciting additional business for the *subsidiary* corporation), or perhaps attempting to convince a particular client of the subsidiary to employ Young & Rubicam, Inc. at its U. S. representative. Where plaintiff has proved, in detailed rather than general terms, that an individual was involved in this kind of activity, a deduction *for the compensation paid for these activities is allowable.*

In addition, we have rejected plaintiff's alternative argument. Our discussion summarizes the facts established by the record.

Plaintiff paid all of the compensation of certain individuals who were involved in the performance of the day-to-day operations of a subsidiary. It cannot deduct the entire compensation and fringe benefits paid for these services. Our problem is that some of these and other individuals (who received only part of their compensation from plaintiff) devoted some part of their total working time to activities which directly benefitted plaintiff. We start our analysis of this record with the premise that unless plaintiff has proved that an individual performed specific activities for plaintiff, it cannot deduct his compensation as its expense.

The employees divide into two groups: In the first group are Messrs. Austin, Brandi, Miller, Hoyt, DeVos, Zerbe, Hardy, Nussbaum, Gaudier and Lyon.[4] The

---

4. In summary, the record establishes the following information: Austin was the manager of the Young & Rubicam Puerto Rican corporation. Brandi replaced Austin. Miller was the art director and a supervisor in Puerto Rico. Hoyt was the creative head of the San Juan office. DeVos was the assistant manager for client services in the San Juan office. Zerbe serviced many of the accounts of the Penn-Zerbe agency which Young & Rubicam, Inc. had acquired. Hardy was the managing director in Venezuela for the last few months of 1960. Nussbaum was employed in the German subsidiary. Gaudier was transferred from Toronto to Germany where he worked with the problems posed by the television media in Germany.

Lyon presents a unique situation. Plaintiff paid him a bonus for his activities in solving the problems of a

proof does not reveal specific activities performed by these men directly for plaintiff's benefit and, therefore, plaintiff is not entitled to deduct any part of their salary as its own expense.

The second group contains the remainder of the 21 individuals. Their activities justify some deduction. In those cases where plaintiff paid all of the salaries earned, part of their total salary may be deductible, and an allocation will be necessary, perhaps on the basis of the amount of time devoted to specific activities on behalf of plaintiff or any other appropriate basis for a reasonable allocation. It consists of Messrs. Martinez, Vaamonde, Gearon, Waldron, Reynolds, Olmstead, Schmitt, Lacey, Brody, Casey and Buckingham.[5]

Plaintiff paid the entire salaries of Martinez, Vaamonde, Gearon and, in 1959, also Casey.

Martinez, whose activities we only summarize, was managing director of the Caracas office. Primarily he was responsible for the supervision of the Caracas office, its staff and department supervisors. Any compensation for these activities (directly beneficial to the subsidiary) is not deductible. There is proof, however, that he performed specific activities for plaintiff wholly apart from the business activities in Caracas. For example, he made several trips to investigate the possibilities of expansion into Brazil, Argentina, Colombia and Central America; he was involved in the acquisition of the Noble Agency and in the possible expansion into the Caribbean area. Compensation for these activities is deductible.

During 1960, Martinez was transferred to Mexico. There is scant proof in the record that he thereafter devoted himself to any activity other than the day-to-day operation of the Mexican subsidiary corporation.

Vaamonde presents a comparable problem. He was the manager of the Mexican subsidiary and responsible for its successful operation, i. e., developing talent, making client contacts, etc. Mr. Vaamonde estimated that some 60 to 70 percent of his time was devoted to activities similar to those performed by Martinez. On the basis of this record, some, but not all, of the deduction for his compensation is appropriate.

Gearon was head of contact services in the London office and was involved in solving the problems of clients of Young & Rubicam, Ltd. There is proof, albeit in some instances indefinite, that he devoted some part of his time to servicing the particular needs, other than in England, of clients of Young & Rubicam, Inc. who were not clients of the British corporation. On January 1, 1960, he was assigned to the German office where he was responsible for its day-to-day operations. Certain other activities were undeniably for plaintiff's benefit. He investigated the possibility of expansion into Italy and France, for example. Compensation for time devoted to promoting the advertising business of the German subsidiary among plaintiff's domestic clients, however, is not deductible by plaintiff. Again, we conclude that some but not all of his compensation is deductible.

Casey was sent to England for the express purpose of correcting a problem that involved Procter & Gamble's advertising in England. Plaintiff believed that dissatisfaction with the advertising in England might have led Procter & Gamble to sever its ties with plaintiff and, therefore, Casey was sent to correct the problem and preclude this possibility. It is clear that his efforts directly ben-

Canadian division of a major domestic client who was dissatisfied with the services of plaintiff's Canadian subsidiary. The subsidiary received the direct benefit of Lyon's activities and plaintiff is not justified in deducting compensation it paid him.

5. The precise amount of the deduction allowable for each individual, however, is reserved for the trial commissioner's determination.

efitted the British subsidiary because it was able to retain Procter & Gamble as a client. The residual benefit to plaintiff does not suffice for its claimed deduction.

Any time that Casey devoted to studies for possible expansion into European markets, the preparation of reports and travel in Europe for the purpose of expanding clients' activities in markets other than England were for plaintiff's benefit and compensation therefor is deductible. There is testimony that he spent approximately one-half of his time on problems for plaintiff. If justified by the record, this would appear to be an appropriate basis for allocating his salary between activities for the subsidiary and activities for plaintiff.

Messrs. Brody, Buckingham, Lacey, Schmitt and, in 1960, also Casey, from another subgroup. Plaintiff paid more than 50 percent of each man's salary. The proof presented as to their activities indicates that each devoted a substantial amount of time to specific activities for plaintiff's benefit. Therefore, all of the compensation paid to Brody, Casey[6] and Buckingham is deductible, and some part of that paid to Schmitt and Lacey is deductible.

Brody shared the day-to-day operational duties in the German office with Gearon. In addition, he investigated possibilities for expansion into Austria, Switzerland and France. He investigated and reported on markets in other countries for clients of plaintiff. His activities for plaintiff increased substantially after March of 1960. We find the testimony adequate to establish the details of his activities for plaintiff and find that all of the compensation paid to him is deductible.

Buckingham performed numerous services for plaintiff including trips on plaintiff's behalf to investigate new markets and report on companies which plaintiff might acquire. In addition, he reported to plaintiff on the activities of various subsidiaries. We think that plaintiff has carried its burden of proof as to Buckingham.

Schmitt and Lacey were sent to Germany for the purpose of building a staff of writers and artists. Their activities were primarily devoted to the German market and its problems. There is some testimony that they were involved in the plans for European expansion but the extent of their participation does not appear from the record to justify the salary deduction taken by plaintiff. We conclude, therefore, that some part of the deduction is allowable and here, too, an allocation would seem appropriate.

The final subgroup consists of Messrs. Reynolds, Waldron and Olmstead. (Plaintiff paid less than 50 percent of their salaries.) Each performed specific services for plaintiff. Reynolds was involved in studies for European expansion and developing plaintiff's continental operation and, in addition, he devoted part of his time to obtaining new clients for plaintiff's domestic business. Waldron was involved in similar activities, albeit on a lesser scale. Olmstead was primarily involved in the business activities of the office in Mexico but the record indicates that he was also involved in specific activities directed toward obtaining clients for plaintiff.

In summary, on the basis of a thorough study of the entire record, we disallow the deductions for Messrs. Austin, Brandi, Miller, Hoyt, DeVos, Zerbe, Hardy, Nussbaum, Gaudier and Lyon. We allow a deduction as claimed for Messrs. Brody, Buckingham, Reynolds, Waldron, Casey (1960) and Olmstead. We also allow a partial deduction for Messrs. Vaamonde, Martinez, Gearon Lacey, Schmitt and for 1959 also Casey (the exact amount of which will be determined by our trial commissioner).

6. The activities of Casey were discussed above, on the basis of which plaintiff may deduct the salary paid in 1960.

## B. Travel, entertainment and moving expense reimbursement

The Memorandum re Pretrial Conference records in minute detail the precise amounts paid to specific individuals for travel and entertainment expenses. However, there is a dearth of additional information in the record about each activity's relationship either to a subsidiary's or plaintiff's business.

■ Certain deductions have been conceded by defendant. Plaintiff may deduct the remaining travel or entertainment expenses if it proves that the amount involved was paid for some definite and reasonable purpose connected with *its* business. Again, this is a question of fact. These expenses have been itemized with admirable care. The only remaining problem is "tieing" the expense item to a specific activity.

We return this case to the trial commissioner for a determination of the amount of travel and entertainment expenses deductible as *plaintiff's* expense. In the absence of adequate proof, plaintiff is not entitled to a deduction.

There is one other problem which has not been briefed by either plaintiff or defendant; *i. e.*, the deductibility of moving expense reimbursements paid by plaintiff, a former employer, to employees who moved to a foreign country for the purpose of working for another independent corporate entity. We do not now decide this issue but expect that it will be briefed to and decided by our trial commissioner.

## C. Plaintiff's Second Contention

Plaintiff's alternative argument is that even if the individuals' activities were for the subsidiaries' direct benefit, it may deduct the expenses because they were "motivated by a purpose to protect and promote the plaintiff's own business and its relationship to its own customers." It cites as support, Cubbedge Snow, 31 T.C. 585 (1958), Acq. 1959–1 C.B. 5; L. Heller and Son, Inc., 12 T.C.

1109 (1949); Robert Gaylord, Inc., 41 B.T.A. 1119 (1940); Dunn & McCarthy, Inc. v. Commissioner of Internal Revenue, 139 F.2d 242 (2d Cir. 1943); and James L. Lohrke, 48 T.C. 679 (1967), Acq. 1968–27 I.R.B. p. 7, in addition to the cases relied on by the trial commissioner, Fall River Gas Appliance Co., Inc., 42 T.C. 850 (1964), aff'd, 349 F.2d 515 (1st Cir. 1965); United States v. E. L. Bruce Co., Inc., 180 F.2d 846 (6th Cir. 1950); Scruggs-Vandervoort-Barney, Inc., 7 T.C. 779 (1946); Charles J. Dinardo, 22 T.C. 430 (1954); and Columbian Rope Co., *supra.*

In the unique factual circumstances of the above cases, courts have carved an exception to the general rule that a taxpayer cannot deduct amounts paid for expenses of another taxpayer. See Welch v. Helvering, *supra.* We do not find that the circumstances surrounding the deductions claimed by plaintiff are within the narrow exceptions espoused by these cases.

In Charles J. Dinardo, *supra*, taxpayers were doctors who had organized a nonprofit hospital for their patients' use. Amounts paid to the hospital when it incurred a current operating deficit, for the purpose of insuring its continued existence, were held deductible.

In Cubbedge Snow, *supra*, taxpayers were real estate attorneys who had organized a Federal savings and loan association to promote their title abstract law practice. They paid an operating deficit of the savings and loan association to insure their continued source of business.

In Heller and Son, Inc., *supra*, a corporate taxpayer paid the debts of its bankrupt subsidiary for the purpose of reestablishing its own lost credit rating (which was essential for its continued existence). Scruggs-Vandervoort-Barney, Inc., *supra*, involved a corporate taxpayer who paid depositors' losses caused by the failure of a bank closely associated with plaintiff taxpayer (97 percent stock ownership). Amounts paid to

preclude an imminent threat of lost business justified the expense as one made to protect plaintiff's existing business.

In Dunn & McCarthy, Inc., *supra*, a corporate taxpayer repaid loans made by its seven top salesmen to its former president. In return, it received assignments of their claims against the president's estate. Its existing business was dependent upon the activities of these men, and these amounts were therefore held deductible.

In James L. Lohrke, *supra*, an individual agreed to make good any losses caused by defective products that were sold by a corporation to which he had given a nonexclusive patent license. The amounts were paid to preserve the value of his patent-licensing business and were held deductible.

In Robert Gaylord, Inc., *supra*, taxpayer made payments pursuant to its guarantee given to a bank to insure the bank against any losses from its acquisition of another bank which was about to fail. The guarantee was given and payments were made to protect plaintiff against an immediate, substantial loss of business if the bank had failed; more immediate was the danger that it would have been unable to collect its own existing credit accounts.

All of these cases involved a clear proximate danger to the taxpayer and each involved a payment made to protect an existing business from harm. In our case, assuming that the claimed deductions by Young & Rubicam, Inc. were for the subsidiaries' benefit, they were general operating expenses of a subsidiary and plaintiff has not proved that they were made either to prevent proximate harm or to protect plaintiff's *existing* business from such harm.

It is true that plaintiff was encouraged to enter the field of international advertising by some of its domestic clients. Plaintiff claims that these amounts were deductible because it faced a possible loss of domestic business if the service given by its subsidiaries was inadequate. We are not convinced by the evidence before us that plaintiff was threatened with a direct and immediate loss of domestic business if its subsidiary did not perform the services requested by a client of both the subsidiary and plaintiff. (Of course, the subsidiary was likely to lose some business.) Moreover, the possibility of any loss of domestic business was remote from the payments made for salaries, compensation and other claimed expenses. The exception adopted by the above cases turns on a proximate danger or benefit and they generally do not involve payments by a parent corporation for the current operating costs of its subsidiary. Plaintiff paid these costs primarily to obtain better personnel for its subsidiaries and to improve their operations, and any benefit to it was indirect.

The only case cited which tends to give some support to the claim that these expenses were made to promote plaintiff's domestic business is Fall River Gas Appliance Co., *supra*. In that case, a parent gas company paid the installation, selling and miscellaneous expenses of its subsidiary, a gas appliance company. The Tax Court found that the direct relationship between an increase in taxpayer's gas sales and the number of appliances sold by the subsidiary was sufficient to allow the parent a deduction. The court noted that this was not the typical case of a parent company paying its subsidiaries' expenses.

In our case, there is no comparable direct link between an increase in the subsidiary's foreign advertising and the domestic advertising of plaintiff. This is the more typical instance of a parent corporation paying the expenses of its subsidiary. For the above reasons, we reject plaintiff's alternative argument and allow recovery of a refund for both 1959 and 1960 only to the extent discussed above in parts A and B.

## II. Section 482

The second question for determination is whether section 482[7] was properly invoked by the Commissioner of Internal Revenue for the year 1960. An affirmative answer would, in turn, lead our inquiry into a number of subsidiary questions, such as: whether proper notice regarding the allocation was given to the plaintiff and whether, in fact, an "allocation" was made. We note that the 90-day letter did not show how the subsidiaries were to be charged with income. Our determination of this issue, however, does not require resolution of these subsidiary questions.

■ Under section 482, the Commissioner is authorized to distribute, apportion or allocate gross income or deductions between or among related taxpayers, when he determines that it is necessary to prevent the evasion of taxes by, or clearly to reflect income of, such taxpayers. The section was designed to prevent evasion of taxes by such devices as "shifting of profits, the making of fictitious sales and other methods frequently adopted for the purpose of 'milking'." H.R.Rep. No. 2, 70th Cong., 1st Sess., p. 16; S.Rep. No. 960, 70th Cong., 1st Sess., p. 24. Its purpose is to prevent the arbitrary shifting of income and deductions among controlled corporations and to place such corporations on a "tax parity" with uncontrolled corporations. Treas.Reg.Sec. 1.482.1.

Plaintiff has argued that the Commissioner improperly invoked section 482 because, *inter alia*, the action was unnecessary to prevent evasion of taxes or clearly to reflect income, the Commissioner failed to distribute, apportion or allocate income or deductions among related taxpayers, and the determination was arbitrary and produced an unreasonable result. The Commissioner charged plaintiff with having understated its income by the amount which the plaintiff failed to charge its subsidiaries for management and administrative services allegedly performed by the plaintiff for such subsidiaries. There is substantial confusion in the record as to the exact original basis of the Commissioner's allocation. Before the trial commissioner, the government admitted that the allocation was not supported by the Revenue Agent's theory (which formed the basis of the Commissioner's allocation and deficiency assessment) but argued that the ultimate amount allocated is reasonable on the basis of the value of the management services performed by *four of plaintiff's employees*—Wilkerson, Hagen, Penn and Hardy. Defendant argues that the Revenue Agent's methods are therefore irrelevant and that the allocation was reasonable and supported by the record before the court. *See*, Oil Base, Inc. v. Commissioner of Internal Revenue, 362 F.2d 212 (9th Cir. 1966), cert. denied, 385 U.S. 928, 87 S.Ct. 287, 17 L.Ed.2d 211.

■ Generally, because the Commissioner is given wide discretion, the taxpayer not only has the burden of overcoming the presumptive correctness of the Commissioner's action but also proving that his section 482 determination (or a determination based on a predecessor section) was arbitrary or capricious. *See*, National Securities Corp.,

---

7. United States Code, 1964 Ed., Title 26, § 482:

"§ 482. Allocation of income and deductions among taxpayers.

"In any case of two or more organizations, trades, or businesses (whether or not. incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the

Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

46 B.T.A. 562, 564 (1942), aff'd, 137 F.2d 600 (3d Cir. 1943), cert. denied, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943); G.U.R. Co. v. Commissioner of Internal Revenue, 117 F.2d 187 (7th Cir. 1941); Aiken Drive-In Theatre Corp. v. United States, 281 F.2d 7 (4th Cir. 1960); and Leedy-Glover Realty & Insurance Company, 13 T.C. 95, 107 (1949), aff'd, 184 F.2d 833 (5th Cir. 1950). If the Commissioner's action is subjected to judicial review, the taxpayer bears the heavier than normal burden of proving arbitrariness (see, Campbell County State Bank, Inc. v. Commissioner of Internal Revenue, 311 F.2d 374 (8th Cir. 1963)), and therefore it has been held that the Commissioner must give the taxpayer fair notice in advance of trial that he is acting pursuant to section 482 (see, Commissioner of Internal Revenue v. Chelsea Products Company, 197 F.2d 620 (3rd Cir. 1952)), and if the Commissioner makes no mention of the section 482 issue in his deficiency notice, the Tax Court has expressed some doubts as to the government's ability to raise this issue for the first time at trial (see, Chicago and North Western Railway Company, 29 T.C. 989 (1958)), or in its opening statement (see, Seminole Rock and Sand Co., 19 T.C. 259 (1952)), or on brief (Burrell Groves, Inc., 16 T.C. 1163 (1951); Palm Beach Aero Corp., 17 T.C. 1169 (1952)).

We can assume that plaintiff received adequate notice that a section 482 issue was involved in the deficiency assessed for 1960. We have before us, however, the unusual circumstance where the government has not argued that the Commissioner's determination is justifiable on the basis of the calculations made by the Revenue Agent or other Internal Revenue Service personnel, but rather that wholly different reasons proved to the trial commissioner support the amount of the allocation.

■ The record facts which defendant argues support the allocation, we find do not. We conclude that the evidence does not justify the Commissioner's allocation and that the specific transactions relied on by defendant are not subject to an allocation.

■ The Commissioner may allocate costs or deduction to properly reflect managerial, administrative or other services performed by one member of a group for another member. Allocation is an attempt to reflect the true income of related companies as if the services had been performed by an unrelated entity. See, Eli Lilly & Co. v. United States, 372 F.2d 990, 178 Ct.Cl. 666 (1967); and Oil Base, Inc. v. Commissioner of Internal Revenue, 362 F.2d 212 (9th Cir. 1966), cert. denied, 385 U.S. 928, 87 S.Ct. 287, 17 L.Ed.2d 211. The Commissioner allocated income to plaintiff to measure the value of the managerial services it purportedly performed for the subsidiaries through four individuals—Messrs. Wilkerson, Hagen, Penn and Hardy. Unlike the 21 individuals involved in section I of this opinion, they were not assigned to continuous duty abroad with a particular subsidiary, and we are not faced with the question of the deductibility of their salaries. The fact question is whether they performed general supervisory services for plaintiff or they performed managerial services for a subsidiary for which the subsidiary would have paid a fee had they been performed by an unrelated corporation. Our conclusion is that the activities proved were general supervision for plaintiff and that no support exists in this record for the allocation. Supervisory functions such as these are not subject to allocation under section 482.

Many of these activities benefitted the subsidiaries, but we are concerned with whether the functions performed were supervisory controls for plaintiff or specific management services for a subsidiary. The nature of these activities, as reflected in the record and relied on by defendant, are summarized as follows:

Wilkerson was a senior vice-president of plaintiff and head of its International

Division from January 1 through April 19, 1960. The International Division was responsible for the general supervision of subsidiary corporations and promoting additional foreign expansion. Wilkerson was directly responsible to plaintiff's president and its Board of Directors.

In 1959, plaintiff received complaints that the Creative and Research Departments of its German office were not developing satisfactory material. General Foods had threatened to terminate its relationship with the German subsidiary. Wilkerson traveled to Frankfurt when Gaudier replaced Nussbaum as managing director and met with representatives of the subsidiary's clients. He had represented General Foods as plaintiff's client and had substantial contacts with personnel in the General Foods headquarters in New York. He made several trips to Frankfurt, and eventually the problem was solved.

In January 1960 he went to Puerto Rico when Brandi replaced Austin as general manager and installed DeVos as assistant manager. Again he visited with some of the subsidiary's clients. There is no indication that either his activities in Frankfurt or Puerto Rico were management services, rather they were an attempt to exert some "on-the-spot" supervision.

Lyon had been sent to Toronto to correct a particular problem with the Whitehall Laboratories Ltd. account and, in April 1960, Wilkerson traveled to Toronto to discuss the problem. He also made several trips to London.

During 1960 he made several new business presentations to companies interested in marketing their products internationally. One of his general functions as head of the International Division was to encourage companies to hire all of plaintiff's subsidiaries as their representatives for particular markets.

On the basis of this record, we conclude that his activities were in the nature of supervisory controls or other general activities for plaintiff and not management services for the business of a particular subsidiary.[8]

Hagen was a vice-president in charge of Western Hemisphere corporations. He reported to Wilkerson until April, 1960 and thereafter to the plaintiff's president. His responsibility was to make certain that the various offices maintained plaintiff's production standards and that the subsidiaries performed their duties to their clients' satisfaction. He frequently traveled to the offices of a subsidiary's clients to hear complaints and accept general comments on the activities of a particular subsidiary.

In 1960, plaintiff decided to consolidate its Montreal and Toronto offices and Hagen traveled to Toronto to solve any personnel problems that might arise in connection with the consolidation. He also made three trips to Mexico City to discuss general problems with Vaamonde and his replacement Martinez. He also

---

8. At trial, defendant conceded the deductibility of part of Wilkerson's salary because he did not perform any of the day-to-day functions of the London office. Part of that concession reaffirms our conclusion that he performed general supervisory activities on plaintiff's behalf.

"To the extent that payments were made while Mr. Wilkerson was engaged in associated business and international business while he was in the United States [January 1 through April 19, 1960], he was performing services in taxpayer's trade or business.

"While he was abroad and to the extent that he was also working in the international division, his services were of an investment nature, the kind that a corporation may properly pay to top executives who supervise their investments, being here subsidiary corporations.

" * * * [H]e was the one individual abroad who did have this supervisory control over, not just one corporation and therefore engaged in the trade or business of the subsidiary corporation, but he was supervising three corporations and he was looking for new investments, Paris, Italy, Belgium and other places * * *. [Tr. 83–84]"

made one trip to Caracas. Again, the record proves that these were general supervisory activities which assisted plaintiff in its attempt to control the activities of its subsidiaries.

Penn had been a partner in the Penn-Zerbe advertising agency which plaintiff acquired in 1956. He became a managing director of New York International Services and during 1960 traveled to San Juan together with Wilkerson when DeVos replaced Austin as managing director. He attended presentations by San Juan personnel to their clients. He made five trips to Caracas and met with Young & Rubicam de Venezuela's clients together with personnel from the subsidiary. He also made one trip to Mexico City. There is no proof of the specific managerial services which defendant alleges he performed for the subsidiaries.

Hardy was an account executive assigned to New York International Services from February 16 to October 9. On May 16, he traveled to Caracas where he remained until June 20. He managed the office when Martinez traveled to the United States. Later in the year he went to Venezuela.

He also traveled to Mexico City together with representatives of clients to meet with Vaamonde and solved several problems that had developed. This was part of a general circuit trip to other parts of Central and South America. His activities were also supervisory.

We think that the above summary shows that the activities relied on by defendant to support the Commissioner's allocation were part of plaintiff's attempt to control its subsidiaries, their personnel and offices. There is no evidence that these four individuals performed specific managerial services for specific subsidiaries, and therefore we must conclude that the allocation is not supported by the record and that the Commissioner's allocation was improper. Plaintiff is entitled to recover a refund on this issue. Accordingly, judgment is entered for plaintiff, with the amount of recovery to be determined pursuant to Rule 47(c).