T.C. Memo. 2001-43

UNITED STATES TAX COURT

ALAN G. BONE AND KATHLEEN A. BONE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JEFFREY M. GUERRERO AND GENEDINE R. GUERRERO, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20220-98, 20221-98.     Filed February 23, 2001.

James L. McDonald, Sr., for petitioners.

Larry D. Anderson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  In separate notices of deficiency,[1]
respondent determined deficiencies in petitioners' income taxes
as follows:

_____

[1] These cases have been consolidated for purposes of trial,
briefing, and opinion.

| Docket No. | Year | Deficiency |
|------------|------|------------|
| 20220-98 | 1993 | $524,103 |
| 20221-98 | 1993 | 545,324 |

After concessions,[2] the issues for our consideration are: (1) Whether A.J. Concrete Services, Inc. (AJCS), is entitled to deduct $2,261,555 in expenses; (2) whether AJCS overreported its income by $2,680,500; (3) whether AJCS is entitled to a $269,815 deduction for accrued workmen's compensation expense. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the periods under consideration, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[3]

Petitioners Jeffrey and Genedine Guerrero resided at 4215 Osprey Pointe, Woodstock, Georgia, on the date their petition was filed. Petitioners Alan and Kathleen Bone resided at 617 North Lake Drive, Canton, Georgia, at the time their petition was filed.

---

[2] Respondent concedes that A.J. Concrete Services, Inc. (AJCS), is entitled to $444,766 in 1993 for costs of goods sold. This represents the depreciation that AJCS claimed on concrete forming devices.

[3] The parties' stipulation of facts is incorporated by this reference. We also incorporate by this reference our findings of fact in A.J. Concrete Pumping, Inc. v. Commissioner, T.C. Memo. 2001-42, and Guerrero v. Commissioner, T.C. Memo. 2001-44.

A.J. Concrete Services and the Four Affiliates

Alan Bone (Mr. Bone) and Jeffrey Guerrero (Mr. Guerrero) owned 49 percent and 51 percent, respectively, of AJCS, an S corporation incorporated in 1987 and engaged in the business of supplying construction forming equipment and materials to various contractors.[4]  AJCS, a calendar year taxpayer, maintained its books on the percentage of completion method for financial accounting purposes and the completed contract method for tax purposes.

As of December 31, 1992, AJCS owned ongoing construction contracts with a total value of $19,975,949 and estimated projected gross profits of $8,763,221.  AJCS' schedule of contracts reflects that, as of December 31, 1992, it had $2,680,500 of recognized gross profit on its partially completed contracts.

On January 1, 1993, AJCS transferred its incomplete contracts to four C corporations:  A.J. Concrete Forming of Georgia, Inc. (Georgia); A.J. Concrete Forming Central, Inc.

---

[4] Petitioners object to this finding of fact and contend that AJCS "utilized its own construction forming forms, not equipment, in the business of concrete forming services."  Our finding, however, was agreed to and stipulated by the parties.  A party is not permitted to contradict a stipulation in whole or in part, except in the interest of justice.  See Rule 91(e); Stamos v. Commissioner, 87 T.C. 1451, 1454 (1986).  We do not find any injustice to petitioners here and hold the parties to their stipulation.

(Central); A.J. Concrete Forming East, Inc. (East); and A.J. Concrete Forming West, Inc. (West).[5]

The stock ownership of these four affiliates[6] was as follows: (1) Georgia was owned 47.5 percent by Mr. Guerrero, 47.5 percent by Jeff Klewein, and 5 percent by Jeff Hoylman; (2) Central was owned 47.5 percent by Jeff Klewein, 47.5 percent by Rick Klewein, and 5 percent by Dave Entinghe; (3) East was owned 47.5 percent by Rick Klewein, 47.5 percent by Mr. Bone, and 5 percent by Robb Webb; and (4) West was owned 47.5 percent by Jeff Klewein, 47.5 percent by Mr. Bone, and 5 percent by Ken Ritter.

On its 1993 tax return, AJCS reported the $2,680,500 it had recognized on its partially completed contracts. On its 1993 tax return, AJCS claimed deductions on line 20 totaling $2,808,034.

After transferring all of its outstanding contracts to the affiliates, AJCS was no longer in the construction forming business. AJCS's primary business, after the transfer of the contracts, was to provide management services to the four affiliates that were performing on the contracts. Under agreements, AJCS was entitled to charge each affiliate for a portion of AJCS's general and administrative expenses incurred in

---

[5] Again, petitioners object to this finding as misleading despite the fact that it was taken verbatim from the stipulation of facts.

[6] The term "affiliate" is used for convenience and is not meant to connote "affiliate" as it is defined with regard to the application of any Internal Revenue Code section.

providing management services to the four affiliates, plus a markup percentage in the 3-percent range.

AJCS was entitled to receive the management fees at the time the affiliates completed the contracts. All four affiliates used the completed contract method to report income for Federal tax purposes. For the affiliates' tax years ending in 1993, they reported gross income as follows:

| Affiliate | TYE | Gross Income |
|---|---|---|
| West | Sept. 30, 1993 | $2,394,029 |
| Georgia | Sept. 30, 1993 | 5,962,994 |
| Central | June 30, 1993 | -0- |
| East | Mar. 31, 1993 | 76,116 |

Georgia deducted $490,000 as management fees paid to AJCS on its September 30, 1993, tax return. Central deducted $724,880 as management fees paid to AJCS on its June 30, 1994, tax return. AJCS did not report any management fee income on its 1993 tax return.

The four affiliates extended loans to AJCS during the 1993 calendar year. As of the end of the 1993 tax year, the affiliates had outstanding loans to AJCS as follows:

| Affiliate | Loan Amount |
|---|---|
| West | -0- |
| Georgia | $1,674,722 |
| Central | 568,065 |
| East | 80,201 |

AJCS reported taxable income of $117,018, $358,860, and $309,967 for the 1990, 1991, and 1992 tax years, respectively. AJCS's and the four affiliates' "schedule of contracts" for the

1993 calendar year shows a recognized gross profit of $6,405,360. The 1993 combined operating loss reflected on the combined income statement for AJCS and the four affiliates is $37,706. On the combined financial statements and independent auditors report, AJCS's and the four affiliates' "combined statement of earnings" is also listed as a loss of $37,706.

AJCS, for Federal tax purposes, reported a $236,300 loss for its 1993 tax year. The four affiliates reported Federal tax losses for the tax year ending 1993 as follows:

| Affiliate | Reported Loss |
|-----------|---------------|
| West | ($72,041) |
| Georgia | (5,507) |
| Central | (8,873) |
| East | -0- |

The combined Federal tax loss reported for the 1993 calendar year by AJCS and the four affiliates is $322,721.[7]  AJCS and the four affiliates reported tax losses in their subsequent reporting periods as follows:

| Company | TYE | Reported Loss |
|---------|-----|---------------|
| AJCS | Dec. 31, 1994 | ($577) |
| West | Sept. 30, 1994 | (300,451) |
| Georgia | Sept. 30, 1994 | (222,782) |
| Central | June 30, 1994 | (14,627) |
| East | Mar. 31, 1994 | (354,826) |

The Schedules L, Balance Sheet, attached to AJCS's 1993 and 1994 tax returns do not reflect the same 1993 ending figures as the amounts reflected for the 1994 beginning figures with respect

---

[7] AJCS and the four affiliates did not file a consolidated return for the tax periods under consideration.

to its assets reported on line 6 and its liabilities reported on line 18. On its 1993 Schedule M-1, Reconciliation of Income (Loss) per Books With Income (Loss) per Return, AJCS reported a loss of $37,706, which represents the combined income for AJCS and the four affiliates.

Respondent determined that $2,261,555 of the $2,808,034 deducted on AJCS's 1993 tax return was expended for completing the contracts that had been transferred to the four affiliate corporations.

Workmen's Compensation Expenses

In 1993, AJCS had transferred its contracts to the four affiliates and, as a result, had no employees performing concrete forming work. AJCS, however, deducted $135,194 as insurance on line 19 of its 1993 return. AJCS accrued $269,815 as a workmen's compensation insurance liability on its 1993 return. In computing its 1993 taxable income, AJCS reversed the workmen's compensation accrual.

AJCS made payments of approximately $275,000 to various insurance companies. West and Georgia for their years ended September 30, 1993 and 1994, and Central for its years ended June 30, 1993 and 1994, did not claim a workmen's compensation or insurance expense on line 26 of the corporate Federal tax returns. West reported a relatively large amount of cost of goods sold, but no breakdown was provided to reflect whether

workmen's compensation or insurance expense had been claimed within cost of goods sold.

East was the only affiliate that was shown to have deducted an insurance expense for workmen's compensation. East's short year return for the period ended March 31, 1993, reflects a $5,332 deduction on line 26 for "W/C insurance", and East's Schedule M-1 reflects a "W/C accrual" of $83,536. No workmen's compensation insurance deduction is listed on East's March 31, 1994, return.

## OPINION

Petitioners were the shareholders of AJCS, an S corporation. Accordingly, any adjustment to AJCS flows through to petitioners. Respondent determined that several adjustments were necessary to items reported on AJCS's 1993 return, resulting in flowthrough adjustments and income tax deficiencies for petitioners' 1993 taxable year.

I. AJCS's Expenditures in Connection With the Contracts Transferred to the Affiliates

The first issue for our consideration is whether AJCS's expenditure of $2,261,555 is deductible as AJCS's ordinary and necessary business expenses or whether those expense obligations pertained to the four affiliates.[8]

---

[8] With respect to the $2,261,555 adjustment, respondent has abandoned his alternative argument under which allocations of the $2,261,555 in expenses would have been made to the four

(continued...)

Section 162 allows a deduction for all ordinary and necessary expenses incurred in carrying on a trade or business. As a general rule, payment by one taxpayer of the obligation of another taxpayer is not an ordinary and necessary expense. See Welch v. Helvering, 290 U.S. 111, 114 (1933). Generally, courts have held that where one taxpayer pays expenses on behalf of another taxpayer, the expenses are not deductible. See Deputy v. du Pont, 308 U.S. 488 (1940); Dietrick v. Commissioner, 881 F.2d 336, 339 (6th Cir. 1989), affg. T.C. Memo. 1988-180.

Respondent contends that AJCS's claimed $2,261,555 deduction on its 1993 tax return represents expenses that AJCS paid to complete the construction projects that had been transferred to the four affiliates and, therefore, are not deductible expenses of AJCS. Petitioners agree that the expenses paid by AJCS were in aid of the completion of the transferred contracts of the four affiliates. Nevertheless, petitioners advance several arguments in support of the position that the expenses are deductible by AJCS.

First, petitioners argue that the facts of this case fit within the narrow exception carved out by this Court in Lohrke v. Commissioner, 48 T.C. 679 (1967). In Lohrke, we held that a taxpayer may deduct the expenses of another taxpayer in

8(...continued)
affiliates (operational entities), pursuant to sec. 482.

situations in which the taxpayer's payment of the business expenses of another serves to "protect or promote" the taxpayer's own business. Id. at 685.

AJCS must show that its motive for paying the affiliates' expenses was in furtherance or promotion of AJCS's trade or business. See id. at 688. Secondly, AJCS must show that the expenses are ordinary and necessary expenditures in furtherance of its trade or business and not just in furtherance of the affiliates' trade or business. See id.

To determine AJCS's motive for payment of the affiliates' expenses, we can consider whether there is "a clear proximate danger to the taxpayer and * * * a payment made to protect an existing business from harm." Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 410 F.2d 1233, 1243 (1969). The deduction is not available if the paying taxpayer fails to demonstrate a direct nexus between the purpose of the payment and the taxpayer's business or income-producing activities. See Lettie Pate Whitehead Found., Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979).

In an attempt to come within this narrow exception, petitioners argue that AJCS was bound by contract to pay the costs of completing the contracts and, further, that the affiliates could not afford the expenses. We find petitioners' arguments unpersuasive. Petitioners also point out that AJCS was

under contract with the affiliates to transfer the contracts and, also, to pay the expenses in connection with the transferred contracts. This contract offered by petitioners was unsigned and undated and is lacking in the usual earmarks of a contract that has been negotiated at arm's length. In addition, Mr. Bone and Mr. Guerrero owned significant interests in the affiliates. Without further explanation, the proffered document appears to be little more than an attempt to assign expenses from one related taxpayer to another. More significantly, petitioners have not shown that AJCS had a valid business reason for agreeing to pay the costs to complete contracts from which it would not automatically or directly receive any part of the gross proceeds. By way of contrast, the amounts of the affiliates' expenses paid by AJCS are substantially more than the management services fees that it could have earned or did earn. There was no reasonable expectation of recovery by AJCS of enhancement to its business through those expenditures. Accordingly, we find unpersuasive petitioners' evidence that AJCS was contractually bound to pay the expenses of the affiliates or that any such payment of expenses by AJCS would have furthered or promoted AJCS's trade or business.

Petitioners also argue that the four affiliates could not afford to pay their own expenses. That argument is directly contradicted by the record. During the period in question, three

of the four affiliates lent money to AJCS in their first fiscal year, which, to some extent, paralleled AJCS's 1993 taxable year.[9]  The affiliates' returns disclose outstanding loans to AJCS at the end of their 1993 fiscal years totaling more than $2,300,000.  This fact undermines petitioners' argument that the affiliates were unable to pay their own expenses.  Arguably, some of AJCS's payments of the affiliates' expenses could have conferred some benefit on AJCS.  Petitioners, however, have not shown any such benefit and have failed to show that they satisfied the Lohrke test.

Petitioners also argue that AJCS was entitled to deduct the expenses because AJCS could not allocate its general and administrative expenses among the various contracts transferred to the affiliates.  At trial, John Snider, AJCS's chief financial officer, testified that the affiliates paid AJCS a "fee based on the proportional overhead that applies to the revenue and expenses", and "the overhead for * * * [general and administrative] expenses was charged to the * * * [affiliates] based on their revenues."  Accordingly, petitioners' contention that AJCS could not allocate its general and administrative expenses to each transferred contract is, in effect, incorrect.

---

[9] Petitioners contend that the amounts listed as loans on the affiliates' tax returns are actually intercompany accrued expenses/reimbursements so as to track what each affiliate and AJCS owed each other.  Petitioners have not presented corroborative evidence to support their characterization.

Petitioners also make the argument that they "were advised by their respective professionals that the spin-off of the open jobs in process for 1992 would be tax-free pursuant to IRC 355" and it was the "specific intention of the shareholders of * * * [AJCS] to avoid a taxable transaction". This argument is not supported in the record. Petitioners have not shown that AJCS's transfer of its contracts qualified as a tax-free reorganization or spinoff. More importantly, whether AJCS's transfer of open jobs in process qualifies as a tax-free reorganization has no bearing on whether AJCS is entitled to deduct the expenses paid on behalf of other corporations.

Petitioners also cited several cases without attempting to analyze the facts and law of those cases and how they apply to the facts and circumstances in our record. Petitioners cite Mel Dar Corp. v. Commissioner, 309 F.2d 525 (9th Cir. 1962), and Frank Lyon Co. v. United States, 435 U.S. 561 (1978). Those cases deal with the claim of right doctrine and a sale and leaseback, respectively. We fail to see the relevance of the above-referenced cases to the dispute currently before us. In the absence of any analysis or explanation by petitioners, we find these case citations unhelpful.

Petitioners also attempted to show that respondent's determination is in error by attempting to show that respondent's revenue agent's examination may have been inadequate.

Petitioners have not shown that respondent's determination is without substance or that it would be appropriate to go behind the notices of deficiency. Petitioners' attempt to discredit respondent's agent appears to be a detour or distraction from petitioners' failure to present facts and/or law that would show their entitlement to the claimed items.

On the basis of the foregoing, we hold that petitioners have failed to show that they are entitled to deduct the expenses paid by AJCS on behalf of the affiliates. Accordingly, we sustain respondent's determination that AJCS is not entitled to deduct expenses of $2,261,555 that were expenses of the four newly formed affiliates.

## II.  Did AJCS Erroneously Overstate Its Income?

Next, we consider petitioners' contention that AJCS overstated its income by $2,680,500. On brief and for the first time in the course of the trial, petitioners raised an issue as to whether AJCS's 1993 income was overstated because the four affiliates may have mistakenly reported the same income.[10] Although petitioners included an allegation on this point in their petitions, it was not addressed in the opening statement at trial and, accordingly, was not tried by consent and was untimely

---

[10] We must make assumptions because this matter was not factually developed. We assume that petitioners' argument is based on their factual assumption that contract gross incomes reported by AJCS for periods prior to transfer were also reported by the affiliates.

raised.  See Estate of Horvath v. Commissioner, 59 T.C. 551, 556 (1973).

Even if petitioners had timely raised this issue, it is well established that the person who earns or otherwise creates the right to receive income is taxed.  See Lucas v. Earl, 281 U.S. 111 (1930).  The assignment of income doctrine requires compensation to be taxed to the person who earns it regardless of the anticipatory arrangements and contracts, however skillfully devised.  See Leavell v. Commissioner, 104 T.C. 140 (1995).  AJCS earned the income at issue even though it might have been erroneously reported by others.  Accordingly, AJCS may not reduce its income by $2,680,500.

III.  Workmen's Compensation Insurance Expenses

Finally, we consider petitioners' contention that AJCS is entitled to deduct $269,815 in workmen's compensation insurance expenses for its 1993 tax year.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Under section 6001 and section 1.6001-1(a) and (b), Income Tax Regs., a taxpayer must keep such permanent books of account or records as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown on the tax return.

Petitioners must show AJCS's entitlement to the claimed deduction.  See Rule 142(a).

Petitioners allege in their petitions that they are entitled to deduct accrued workmen's compensation expenses of $269,815. Respondent contends that, under section 461(h), petitioners are not entitled to the disputed workmen's compensation insurance expense deductions because petitioners failed to substantiate that the expenses were incurred.

Petitioners, in their posttrial brief, state as follows: AJCS "is also entitled to an additional insurance expense of $269,815 per IRC 162 as this expense was for workers' compensation insurance premiums, not for tort worker's compensation claims that are not allowed until paid per IRC 461." At trial, petitioners' counsel posed to John Snider, chief financial officer of AJCS, a series of generalized questions about workmen's compensation insurance.  That is the extent of petitioners' arguments and proof.  Petitioners made no attempt to explain various exhibits they submitted regarding this issue.

Petitioners submitted copies of checks written from AJCS to various insurance companies.  These checks totaled approximately $275,000.  Petitioners also offered copies of checks remitted by W&J, Inc., to various insurance companies.  These checks totaled over $800,000.  On this record, we remain unaware of the relevance of checks remitted by W&J, Inc.  Finally, petitioners

have not provided the means for the Court to delineate which insurance payments, if any, AJCS is entitled to deduct or were ordinary and necessary expenses of AJCS's business.

Another complicating factor is that AJCS claimed insurance expenses under several different categories on its tax returns. It is impossible to tell from the evidence whether the checks petitioners submitted are already claimed on AJCS's 1993 tax return as insurance under other deductions or whether they are included in other general categories. Finally, the record in this case does not reveal whether the amounts in dispute are AJCS's expenses or more properly those of the affiliates.[11]

Petitioners have failed to show that AJCS is entitled to deduct workmen's compensation expenses of $269,815, and, accordingly, we hold for respondent on this issue.[12]

---

[11] Considering the fact that AJCS transferred its construction contracts to the four affiliates at the beginning of 1993 and began operating solely as a management company, it is more likely that the affiliates, and not AJCS, incurred ordinary and necessary workmen's compensation insurance expense. We must note, however, that East was the only affiliate that obviously claimed a deduction for workmen's compensation insurance during the period under consideration.

[12] Respondent also contends that AJCS is not entitled to the deduction because there had been no economic performance as required by sec. 461(h) and the regulations thereunder. Because of our conclusion above, however, it is unnecessary for us to consider this argument.

We have considered all other arguments of the parties, and, to the extent not addressed herein, we find them to be moot, without merit, or irrelevant.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>