T.C. Memo. 1998-200


UNITED STATES TAX COURT


JRJ EXPRESS INCORPORATED, A CALIFORNIA CORPORATION,
d.b.a. KING EXPRESS INTERNATIONAL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21439-96.                    Filed June 2, 1998.


<u>William E. Crockett</u>, for petitioner.

<u>Marilyn Devin</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined a $1,008,874 deficiency in petitioner's Federal income tax for tax year ended April 30, 1993, and a $201,775 section 6662(a) accuracy-related penalty.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Following a concession by respondent, we must decide: (1) Whether petitioner is entitled to deduct all of its claimed expenses; and if not, (2) whether petitioner is liable for the section 6662(a) accuracy-related penalty.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

The record before us is incomplete; nonetheless, we have attempted, as best we can, to ascertain the facts necessary to resolve the issues before us.

Background

Petitioner (or JRJ), a California corporation, was formed in 1988 by Jose F. Leon (J.F. Leon), its sole shareholder. J.F. Leon was born in Guatemala in 1948, the third oldest brother in a family of 12. He came to the United States in 1968 after family infighting, and subsequently became a U.S. citizen. One of J.F. Leon's brothers, Jose E. Leon, is an officer of JRJ.

At all relevant times petitioner maintained its principal place of business in Los Angeles, California. JRJ timely filed its Federal income tax return for tax year ended April 30, 1993 (the year in issue).

Petitioner's Business--"Outbound Deliveries"

Petitioner is in the courier business, delivering letters and small packages from the United States to Guatemala. During the

year in issue, petitioner conducted business under the names "King Express" and "JRJ Express, Inc."  JRJ operated out of 13 U.S. offices and had some 100 employees. Approximately 78 percent of the items petitioner delivered to Guatemala contained money orders or checks from Guatemalans residing in the United States to their family members back home.

Customers who wished to use petitioner's services could: (1) Personally visit one of petitioner's offices, fill out the necessary form, and pay a fee; or (2) put the item, payment, and accompanying paperwork inside an envelope that was preprinted with petitioner's post office box address.  During the year in issue, petitioner charged a $12 fee for: (1) Transporting the sender's envelope from any U.S. location to petitioner's Los Angeles office; (2) delivering the item to the addressee in Guatemala; and (3) sending a delivery receipt to the sender.

The Guatemalan Companies

Julio Roberto Fong (J.R. Fong) and Ricardo Alfonso Leon (R.A. Leon),[1] brothers of J.F. Leon living in Guatemala, owned and controlled several Guatemalan companies (the Guatemalan companies) that made deliveries of letters, packages, and other items from Guatemala to the United States.  These companies conducted business

---

[1]    At the time of trial, J.R. Fong was deceased; R.A. Leon continued running the Guatemalan businesses.

under the names "Insenasa", "King", and "King Express",[2] and used the identical company logo as petitioner. However, neither the Guatemalan companies nor their controlling owners had financial interests in petitioner. The reverse was also true; neither petitioner nor its sole shareholder had financial interests in the Guatemalan companies.

Distribution Agreement

In May 1989, petitioner, J.R. Fong, R.A. Leon, and the Guatemalan companies entered into a Distribution Agreement (the agreement) which outlined procedures for delivering petitioner's shipments from the United States to Guatemala. Items originating with petitioner in the United States were shipped to Guatemala City by air. They were picked up at the airport by employees of the Guatemalan companies and delivered to the recipient's Guatemalan address by the distribution network of J.R. Fong and R.A. Leon.[3] The couriers customarily secured a receipt signed by the Guatemalan addressee, which was forwarded to petitioner's headquarters in the United States and then mailed through the U.S. Postal Service to the addressor as proof of delivery, together with promotional materials advertising petitioner's services (discussed infra).

---

[2] J.F. Leon, on petitioner's behalf, gave J.R. Fong and R.A. Leon oral permission to use the name "King Express".

[3] Items arriving in Guatemala were tracked to their destination through a computer software program designed by J.F. Leon.

Pursuant to the agreement, petitioner paid J.R. Fong and R.A. Leon a fee (calculated as a percentage of petitioner's gross mail courier revenues) for services provided with respect to the Guatemalan leg of the shipment. The fee was renegotiated annually. For the period May 1, 1992, to April 30, 1993, the fiscal year in issue, the fee was 45 percent of petitioner's gross mail courier revenues.

The Guatemalan Companies' Business--"Inbound Deliveries"

The Guatemalan companies offered courier services from Guatemala to the United States: items originating in Guatemala were shipped by air to Los Angeles International Airport (by either United or Taca International Airlines). The shipments typically consisted of two boxes, each weighing up to 70 pounds. Petitioner picked up the items five or six times a week and processed them for delivery. Petitioner subcontracted with United Presort (an unrelated company in the business of bundling bulk mail into zip codes in order to qualify for reduced postal rates) to pick up the items at petitioner's Los Angeles office. United Presort processed the items and used the U.S. Postal Service to deliver the items to their ultimate U.S. destinations. Petitioner paid United Presort for its service and did not seek reimbursement from the Guatemalan companies.

Each piece of Guatemalan inbound mail came in an envelope with petitioner's insignia. Inside each such envelope was a smaller envelope containing a letter or other documents originating in

Guatemala. Additionally, inside the envelope with petitioner's insignia were return envelopes and promotional brochures advertising petitioner's business.

Oral Agreement

J.F. Leon, on behalf of petitioner, entered into an oral agreement with J.R. Fong and R.A. Leon, on behalf of the Guatemalan companies, whereby in exchange for petitioner's paying various inbound expenses of the Guatemalan companies, the Guatemalan companies would "stuff" promotional and advertising materials (which included a return postage-paid envelope with petitioner's post office box address in blue ink, instructions on how to send money orders and packages to persons in Guatemala, and a list of petitioner's locations in the United States) in all Guatemalan mail bound for U.S. destinations. The Guatemalan companies agreed to bear the costs of printing the envelopes and advertisements. The printing of the advertising material and "stuffing" was primarily performed by the Guatemalan companies in Guatemala at no cost to petitioner; a small part of the "stuffing" was performed in the United States by petitioner's U.S. employees.

A substantial portion of petitioner's business revenues for tax year ended April 30, 1993, resulted from the flow of envelopes stuffed in the Guatemalan mail bound for U.S. destinations.

Petitioner's Federal Income Tax Return

On its Federal income tax return for tax year ended April 30, 1993, petitioner deducted the amount it paid to the Guatemalan

companies pursuant to the Distribution Agreement. This amount totaled 45 percent of petitioner's gross mail courier revenues for the year or $5,163,888. In addition, petitioner deducted other expenses totaling in excess of $6 million and compensation to officers in the amount of $1.87 million.

Notice of Deficiency

In the notice of deficiency, of the total deductions claimed on petitioner's 1993 fiscal year income tax return (apparently including the amount paid pursuant to the Distribution Agreement), respondent disallowed $2,952,091 on the basis that the disallowed deductions were not for petitioner's "own ordinary and necessary business expenses" but rather were for expenses of the Guatemalan companies controlled by petitioner's sole shareholder's brothers. Respondent calculated this $2,952,091 using an indirect method beginning with the cost of postage on items mailed to U.S. destinations. Respondent then allocated a portion of petitioner's indirect expenses to what respondent characterizes as the cost of processing and delivering mail from Guatemala to the United States. Due to a mathematical adjustment, respondent subsequently reduced the disallowed amount to $2,274,751 and made a corresponding reduction in the proposed penalty.

OPINION

Issue 1.  Section 162(a) Expenses

The primary issue for decision is whether petitioner is entitled to deduct expenses which respondent characterizes as the costs of processing and delivering mail from Guatemala to the United States.  Petitioner contends that these so-called inbound delivery expenses were incurred for valid business reasons: (1) The inbound mailings included petitioner's promotional materials which generated substantial business to petitioner during the year in issue, and (2) the inbound mailings were used to provide petitioner with a continuously updated mailing list.  Thus, petitioner asserts that the "inbound delivery expenses" were tied directly to its outbound courier business inasmuch as they were incurred both to develop new business and maintain (or protect) its ability to contact current or previous  customers.  Respondent, on the other hand, argues that petitioner was not in the business of delivering items from Guatemala to the United States, and thus the expenses are nondeductible. Respondent further contends that petitioner's business was not conducted at arm's length but rather as a "cooperative Guatemala-U.S. venture" between family members.

Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  The test is whether a "hardheaded" businessperson, under the circumstances, would have incurred the expense.  See, e.g., Cole v.

Commissioner, 481 F.2d 872, 876 (2d Cir. 1973), affg. T.C. Memo. 1972-177.

It is axiomatic that to be deductible under section 162, the business expense must be incurred in the taxpayer's own trade or business and not the trade or business of another. E.g., Interstate Transit Lines v. Commissioner, 319 U.S. 590 (1943); Deputy v. duPont, 308 U.S. 488 (1940); American Lithofold Corp. v. Commissioner, 55 T.C. 904, 921-922 (1971); Lohrke v. Commissioner, 48 T.C. 679, 684 (1967). A narrow exception to this rule has been carved out for situations in which the taxpayer's payment of the business expenses of another serves to "protect or promote" the taxpayer's own business. See Lohrke v. Commissioner, supra at 684-685.

A two-prong test was enunciated in Lohrke in order to determine whether a taxpayer falls within the narrow "protect or promote" exception to the general rule against a taxpayer deducting expenses incurred on behalf of the business of another. First, we must "ascertain the purpose or motive which cause the taxpayer to pay the obligations of the other person". Id. at 688; see also Snow v. Commissioner, 31 T.C. 585, 591 (1958). Second, the taxpayer must show that the expense is an ordinary and necessary expenditure in furtherance of its trade or business, not in furtherance of the trade or business of the other taxpayer. Lohrke v. Commissioner, supra at 688. The question must be asked: Was the

expenditure an appropriate expense to further or promote the taxpayer's trade or business?  Id.

In applying the first prong of the Lohrke test, we take into account whether there is "a clear proximate danger to the taxpayer and * * * a payment made to protect an existing business from harm."  Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 410 F.2d 1233, 1243 (1969).  The deduction is not allowed if the taxpayer fails to demonstrate "a direct nexus between the purpose of the payment and the taxpayer's business or income producing activities".  Lettie Pate Whitehead Found., Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979).

Here, the record reflects that the expenses attributable to the incoming packages and envelopes from Guatemala had a definite purpose related to petitioner's outbound U.S.-Guatemala courier business.  Approximately 78 percent of items petitioner delivered to Guatemala contained money orders or checks from Guatemalans living in the United States to their family members back home. For the most part, these individuals had temporary jobs and were highly transient.  There was uncontroverted testimony that most of the inbound mail contained requests for money.  In order to promote petitioner's business, petitioner had to possess the means to communicate with these transient workers. Petitioner accomplished this by creating a "fluid mailing list" of Guatemalans living in the United States for purposes of targeting customers.  We are

satisfied that the lack of current customer addresses would have represented a "clear proximate danger" to petitioner's business.

Petitioner has also satisfied us that its "ultimate purpose" in paying the expenses in question was to "protect or promote" its delivery service from the United States to Guatemala, rather than to benefit the Guatemalan companies. Although the disputed expenses related to the deliveries of packages from Guatemala to the United States which was the business of the Guatemalan companies, petitioner derived a substantial benefit not otherwise available through the insertion of advertisements and other materials of its business into the envelopes originating from Guatemala. The "stuffing" of these materials had a direct nexus with petitioner's U.S.-Guatemala delivery business--the materials provided targeted potential customers with instructions on sending envelopes and small packages from the United States to Guatemala. A large percentage of petitioner's revenues for the year in issue came as a result of the flow of envelopes originating in Guatemala. It cannot be overemphasized that the promotional and marketing process was the centerpiece of petitioner's business. Thus, we conclude that there was a direct nexus between the payment of the expenses in dispute and petitioner's outbound delivery business.

In applying the second prong of the Lohrke test, we are satisfied that the expenses in dispute were appropriate in promoting petitioner's business. Petitioner did not specifically deduct "inbound expenses"--the expenses in dispute. Rather,

petitioner deducted the amount paid under the Distribution Agreement and all other expenses associated with the operation of the courier business. We believe payment of the "inbound expenses" by petitioner constituted a quid pro quo for information and promotional benefits petitioner obtained from the Guatemalan companies. Hence, they were incurred in furtherance of petitioner's business. As stated previously, a substantial percentage of petitioner's business revenues for the year in issue came as a result of the flow of envelopes originating in Guatemala to recipients in the United States.

The record herein reflects that J.F. Leon left Guatemala in 1968 because of a feud with his brothers. We do not believe that he or his brothers would have performed services for one another gratuitously. Rather, we believe that the relationship between J.F. Leon, on the one hand, and J.R. Fong and R.A. Leon, on the other hand, was such that they were "`more independent in action than strangers in blood'". Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 718 (1977) (quoting Jos. N. Neel Co. v. Commissioner, 22 T.C. 1083, 1090 (1954)). Accordingly, we conclude the relationship between petitioner and the Guatemalan companies was at arm's length.

Because we found the relationship between petitioner and the Guatemalan companies was at arm's length, we do not believe it appropriate to substitute our judgment for that of J.F. Leon in determining how much should be paid to the Guatemalan companies.

See, e.g., <u>John P. Scripps Newspapers v. Commissioner</u>, 44 T.C. 453 (1965); <u>W.L. Mead, Inc. v. Commissioner</u>, T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977).  We are satisfied that the amount petitioner paid to the Guatemalan companies was a proper business expense and not as part of a "cooperative-Guatemalan-U.S. venture" between family members as respondent asserts.

To summarize, we do not sustain respondent's disallowance of $2,952,091 from the total deductions claimed on petitioner's 1993 fiscal year income tax return.

<u>Issue 2.  Section 6662(a) Accuracy-Related Penalty</u>

The next issue is whether petitioner is liable for the section 6662(a) accuracy-related penalty.  Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Based upon our holding that no understatement exists, we need not address this issue.[4]

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.

---

[4]    Petitioner requested that it be awarded attorney fees in its petition and briefs.  For us to now consider such an award, petitioner must comply with the requirements of Rule 231.